## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

FEDERAL TRADE COMMISSION,

        Plaintiff,

        v.

CYBERSPY SOFTWARE, LLC, and
TRACER R. SPENCE,

        Defendants.

Case No. 6:08-cv 1872-0RL-31GJK

## MEMORANDUM IN SUPPORT OF PLAINTIFF FTC'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

## I.    INTRODUCTION

Defendants CyberSpy Software, LLC and Tracer R. Spence market and sell "RemoteSpy," a keylogger spyware program that their customers can remotely deploy and secretly install on the computers of unwitting victims to record a victim's every keystroke and more, and to transmit the captured information to remote computer servers where the Defendants store and organize that information for their customers. Defendants advertise this spyware and service (collectively "RemoteSpy") by proclaiming that their customers can "SPY ON ANYONE. FROM ANYWHERE," and supply detailed instructions on how to deceive victims into installing the spyware by disguising it as an innocuous file, such as photos attached to an email. When a consumer victim clicks on the disguised file, the spyware silently installs in the background without

the victim's knowledge or consent.

Once the spyware– which is designed to evade anti-virus protection and firewalls – is installed, it silently sends unencrypted information from the consumer victim's computer to Defendants' servers over the Internet.  Detailed logs of computer activity (including, for example, every keystroke typed and all passwords used) and captured images of the computer screen are stored on Defendants' servers and organized for RemoteSpy customers to have ready, remote access to victims' intercepted information from literally anywhere.  RemoteSpy customers can remotely access this information over the Internet simply by navigating to remotespy.com and typing in their username and password.

Accordingly, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the FTC respectfully requests that this Court issue a temporary restraining order ("TRO") enjoining Defendants from the unlawful sale of spyware, their publishing of consumers' personal information, and their providing others with the means to and instrumentalities to engage in unfair and deceptive acts.[1]

## II.     THE PARTIES

### A.     <u>Plaintiff</u>

Plaintiff **Federal Trade Commission** ("FTC" or "Commission") is an independent agency of the United States Government created by statute.  15 U.S.C.

---

[1] *See* "[Proposed] Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Be Granted," filed concurrently.

§§ 41-58. The Commission enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),

which prohibits unfair or deceptive acts or practices in or affecting commerce. The

Commission, through its own attorneys, may initiate federal district court proceedings to

enjoin violations of the FTC Act and to secure such other equitable relief, including

restitution and disgorgement of ill-gotten gains, as may be appropriate in each case. 15

U.S.C. § 53(b).

**B.    Defendants**

Defendant **CyberSpy Software, LLC** ("CyberSpy Software") is a Florida limited

liability company, with a principal place of business and mailing address at 1512 East

Jefferson Street, Orlando, Florida 32801. Schools Decl. Atts. 3, 4.[2] CyberSpy Software

conducts or has conducted business as RemoteSpy or remotespy.com since at least

August 2005. *Id.*

Defendant **Tracer R. Spence** ("Spence") is the registered agent and manager of

CyberSpy Software and holds himself out as the company's CEO. Schools Decl. Atts. 1,

3, 4. Spence also is registered as both the administrative and technical contact for the

remotespy.com domain name. *Id.* at Att. 1. He is the account holder at the payment

processor for RemoteSpy sales. *Id.* at ¶ 29. Spence owns and has resided at the same

Orlando address listed for CyberSpy Software since March 2005. *Id.* at ¶ 6.

---

[2] The Declaration of Sallie S. Schools ("Schools Decl."), dated November 4, 2008, is attached as **Exhibit C** to the "Exhibits in Support of Plaintiff FTC's Motion for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue" ("Plaintiff's Exhibits"), filed concurrently.

## III.    DEFENDANTS' UNFAIR AND DECEPTIVE PRACTICES

Defendants provide RemoteSpy customers with a turn-key package that allows someone other than the authorized user of a computer to remotely deploy and secretly install harmful spyware on it without the authorized user's knowledge or consent.

### A.    Advertising RemoteSpy

On the remotespy.com home page, Defendants encourage users to:

SPY ON ANYONE.  FROM ANYWHERE.
SECRETLY RECORD EMAIL, CHAT CONVERSATIONS AND
OVERALL COMPUTER ACTIVITY REMOTELY!

Schools Decl. Att. 12.  Defendants promote RemoteSpy as the "most powerful software of it's [*sic*] kind" that can be used to:

Secretly and covertly monitor and record Pc's [*sic*] without the need of physical access.  Record keystrokes, screenshots, email, passwords, chats, instant messenger conversations, websites visited + More in total privacy.

Defendants even advertise RemoteSpy as a substitute for "Lover Spy" – a similar remotely installed keylogger whose distributor was indicated for violating the Wiretap Act, 18 U.S.C. §§ 2511 and 2512, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. *See News Release: Creator and Four Users of Loverspy Spyware Program Indicted* (Aug. 26, 2005), *available at* http://www.usdoj.gov/criminal/cybercrime/perezIndict.htm.  Without making any effort to distinguish their functionality from the indicted scheme, Defendants assert:  "If you need a product that can provide the features that Lover Spy offered then you need

- 4 -

RemoteSpy."[3]  *Id.*

A one-year license for the RemoteSpy software and remote access to the captured

logs costs $89.95.[4]  *See id.* at Att. 14.  Defendants have sold over 13,000 RemoteSpy

licenses.  *See id.* at ¶ 29.

**B.    Customizing RemoteSpy**

Defendants' conduct is particularly dangerous not only because RemoteSpy can

be remotely deployed as an executable file attached to an email, but because Defendants

specifically instruct their customers on how to further disguise the spyware executable to

dupe the unsuspecting consumer victim – employing techniques for which average

computer users would have neither sufficient knowledge nor experience to perform on

---

[3] Defendants' website acknowledges that computer security experts found Lover
Spy "appeared to violate U.S. law," but goes on to say:

> RemoteSpy is a useful alternative to the hacking application lover spy.
> The intentions of such programs are not good but RemoteSpy replaces
> lover spy by offering a professional application that should be used
> legally.  The RemoteSpy Software uses similar techniques as the lover spy
> however, [*sic*] the company backs their product by a legal disclaimer and
> agree to assist law enforcement for any actions taken by the end user
> illegally while using the application.

Schools Decl. Att. 26.

[4] Additional licenses are offered at $19.95.  *See* Schools Decl. Att. 14.  For an
additional $29.95, Defendants recommend an "UnderCover Email Account Service"
providing "[s]tealth email for anonymously sending your RemoteSpy install file without
being traced."  *See id.*  Defendants have sold over one thousand stealth email licenses.
*See id.* at ¶ 29.  Spence is the registrant and administrative and technical contact for
undercovermail.com.  *See id.* at Att. 2.

their own. *See* Good Decl. ¶¶ 15-18, 43-45.[5]

Defendants provide purchasers with the RemoteSpy "Software Guides," which provide step-by-step instructions, including screenshots and examples, for disguising the executable spy module. Schools Decl. Atts. 9-11. For example, because some systems may block executable email attachments, the Software Guides describe how to embed the disguised spy module into a Microsoft Word document that can then be attached to an email. *See id.* at Att. 10. Another Software Guide walks the user through the steps of further disguising the embedded spy module by changing the appearance of the icon and its title or caption:

> As shown above you can choose any icon. For this guide we chose a common picture icon. Also remember to change the caption, the caption will appear under the icon in the word document. Be creative and choose any caption.

*Id.* at Att. 11. In the foregoing Software Guide example, the final product deceptively appears to be an icon representing photographs above the caption "Pictures.jpg." *Id.* Similarly, in the "User Tutorial" section of their website, Defendants use screenshots to demonstrate how to customize the executable and change the name of the RemoteSpy module to an innocuous sounding file name such as "music." *See id.* at Att. 23.

**C.      Difficulty in Detecting RemoteSpy**

Defendants assert that RemoteSpy is "100% UNDETECTABLE" with "Powerful Security Features," including:

---

[5] The Declaration of Nathaniel Good, Ph.D. ("Good Decl."), dated November 4, 2008, is attached as **Exhibit A** to "Plaintiff's Exhibits."

- **Unbeatable Stealth Capabilities** - RemoteSpy offers many levels of stealth capability to prevent the remote user from removing the software. RemoteSpy will not be displayed in the task manager, the process tab (under Windows NT/2000/XP/Vista), or anywhere else where it may be possible for the user to detect it!

- **Cloaking Ability** - For maximum protection, RemoteSpy will cloak itself - in other words, each time it is executed, it will automatically recreate itself elsewhere on the PC to prevent the software from being removed from the individual being monitored.

Schools Decl. Att. 13. Similarly, on their "Frequently Asked Questions" page,

Defendants explain:

> RemoteSpy is completely stealth and designed to install without warning. Once the executable is clicked the monitoring application will be started instantly. There are no signs or warnings whatsoever.
> . . . .
> In most cases a firewall will cause other products to be blocked however, [sic] RemoteSpy uses a special feature to send the logs to our server. A firewall in most cases will not stop RemoteSpy from transmitting recorded data.

Schools Dec. Att. 15. Indeed, as advertised, RemoteSpy fails to adhere to standard

installation procedures and can be impossible for the average consumer to detect on his

own. *See* Good Decl. ¶ 19-20, 46-47. The spyware silently installs and disguises itself in

a hidden directory on the consumer victim's computer and cannot be found where users

would ordinarily look for actively running programs such as the task manager, the list of

running processes, the taskbar, the program list, and the add/remove programs features.

*See id.* at ¶¶ 19-20, 46-47. Many anti-virus and anti-spyware programs have failed to

detect RemoteSpy. *See id.* at ¶¶ 48-71. Indeed, up until mid September 2008, even

Symantec – the leading consumer anti-virus software – did not identify or remove

RemoteSpy.[6] *See id.* at ¶¶ 67-71.  Other leading anti-virus or anti-spyware programs still

fail to detect RemoteSpy on consumer victims' computers.  *See* Good Decl. ¶ 56-66.

**D.**   **Information Collected, Organized, and Stored by RemoteSpy**

RemoteSpy not only collects highly sensitive information from a victim's

computer, it conveniently organizes it.  Shortly after RemoteSpy is installed, the

RemoteSpy customer can log in by entering a username and password at the

remotespy.com homepage.  *See* Good Decl. ¶ 78-79.  Once logged in, the RemoteSpy

customer has access to a "Control Panel" hosted on remotespy.com, which contains links

to the following logs of information collected from the consumer victim's computer:

- Keystrokes Typed
- Chat Transcripts
- Windows Used
- Applications Ran
- Documents Opened
- Activity Log
- Websites Visited
- Passwords Used
- Last Screenshot
- New! Screenshots
- System Information

*See id.* at ¶ 78; Schools Decl. Att. 19.

_____

[6] Even though Symantec now identifies RemoteSpy as spyware, this does not mean that all consumers' computers will be protected.  Not all consumers have security software installed on their computers, and many consumers who do have such software do not regularly update it.  Further, once security software has identified a spyware program, the spyware authors are often able to evade detection once again by changing the file name, size, publisher, or by modifying the program to evade file-signature detection.  For example, as recently as late October 2008, Defendants updated their software such that it was no longer detectable by McAfee – a leading anti-virus program that had previously detected RemoteSpy.  *See* Good Decl. ¶ 56, 65.

- 8 -

For example, in the "keystrokes typed" log, Defendants provide the user with the ability to see either a raw log (*i.e.*, all keystrokes, including deletions) or a formatted log that shows the text in an ordinary readable fashion. *See* Good Decl. ¶ 80. Thus, anything that the consumer victim types at his keyboard is recorded (*e.g.*, a password, the text of email, a word processing document, an online banking or credit card transaction, etc.). RemoteSpy also creates a table of "Passwords Used" that conveniently sorts password data for websites the victim has visited into neat columns listing the the web address, the name of the website, username, password, and the date and time password was used. In the "Password" column, Defendants spell out the victim's password, even if the password was not displayed on the screen as the victim typed (*i.e.*, even if the password appeared as dots ("••••••••") or asterisks ("********") on the screen). *See* Good Decl. ¶¶ 11, 80, 87.

The Control Panel also includes a "Search Logs" function where Defendants provide RemoteSpy customers with the ability to conveniently search all of the foregoing recorded logs for names, terms, or phrases.[7] *See* Good Decl. ¶ 92. The combination of the logs, the formatting provided by Defendants, and the convenience of searching content provide the RemoteSpy customer with a comprehensive view of the majority of actions occurring on a consumer victim's computer. *See* Good Decl. ¶¶ 78- 93.

---

[7] For example, a RemoteSpy customer can search for a person's name or specific word or phrase (*e.g.*, bank, investment, tax return, legal papers, etc.), and the software will produce a list of results wherever the search term appears (*e.g.*, typed in the text of documents or email, chat sessions, document names, Internet searches, names of websites visited, etc.).

**E.**   <u>Consumer Injury</u>

As discussed above and more fully in the declaration of Dr. Nathaniel Good, an expert in computer usability, privacy, and network security, the RemoteSpy keylogger collects a staggering amount of personal information that it organizes and shares with unauthorized third parties. *See* Good Decl. ¶¶ 78- 93. The collection and disclosure of this sensitive personal information causes substantial injury to consumers.  In addition to obvious invasion of privacy concerns, given that RemoteSpy tracks virtually every move on a consumer victim's computer, a potential identity thief could wreak havoc on a consumer's finances with this information.[8]  For example, with just a few mouse clicks, a RemoteSpy customer can fully compromise and take complete control over a consumer victim's password-protected checking and savings accounts.

This spyware also poses significant risks to consumers' health and safety.  Cindy Southworth, an internationally recognized expert on the intersection of technology and domestic violence, including the use of technology by stalkers, has opined that keylogger spyware can and has been used by stalkers and abusers to harm consumers, including

---

[8] In a recent striking example, Mario Simbaqueba Bonilla was able to steal or divert $1.4 million from over 600 victims using personal information and passwords from online banking and financial accounts that he collected by installing a keylogger in hotel business centers and Internet lounges. *See News Release, Foreign National Sentenced to Nine Years in Prison for Hotel Business Center Computer Fraud Scheme* (Apr. 11, 2008), *available at* http://www.usdoj.gov/criminal/cybercrime/bonillaSent.pdf; *see also* Southworth Decl. ¶ 51.

- 10 -

significant emotional and physical injury. *See* Southworth Decl. ¶¶ 29-32, 38-61.[9]

## IV.   LEGAL ARGUMENT

### A.   <u>This Court Has the Authority to Grant the Requested Relief</u>

This Court has the authority to grant the temporary, preliminary, and permanent

equitable relief sought by the FTC. "Section 13(b) of the [FTC Act] authorizes the FTC

to seek, and the district courts to grant, preliminary and permanent injunctions against

practices that violate any of the laws enforced by [the FTC]."[10]  *FTC v. Gem Merch.*

*Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431,

1434 (11th Cir. 1984).  The exercise of this broad equitable authority is particularly

appropriate where, as here, the public interest is at stake. *See Porter v. Warner Holding*

*Co.*, 328 U.S. 395, 398 (1946).  When the public interest is implicated, this Court's

"equitable powers assume an even broader and more flexible character than when only a

---

[9]  The Declaration of Cindy Southworth, MSW ("Southworth Decl."), dated November 4, 2008, is attached as **Exhibit B** to "Plaintiff's Exhibits."

[10]  Courts in this District have granted temporary restraining orders in other FTC Section 5 cases. *See, e.g., FTC v. RCA Credit Services, LLC*, No. 8:08-cv-2062-T-27MAP (M.D. Fla. Oct. 16, 2008); *FTC v. United Home Savers, LLP*, No. 8:08-cv-1735-T-33TBM (M.D. Fla. Sept. 4, 2008); *FTC v. USA Fin., LLC*, No. 8:08-cv-899-T-17-MAP (M.D. Fla. May 12, 2008); *FTC v. Mortgage Foreclosure Solutions, Inc.*, No. 8:08-cv-388-T-23EAJ (M.D. Fla. Feb. 27, 2008); *FTC v. FTN Promotions, Inc.*, No. 8:07-cv-1279-T-30TGW (M.D. Fla. July 23, 2007); *FTC v. Global Mktg. Group, Inc.*, No. 8:06-cv-2272-30TGW (M.D. Fla. Dec. 12, 2006); *FTC v. Gregory Bryant, Jr.*, No. 3:04-cv-897-J-32MMH (M.D. Fla. Sept. 16, 2004); *FTC v. Peoples Credit First, LLC*, No. 8:03-cv-2353-T17TBM (M.D. Fla. Nov. 10, 2003); *FTC v. Thomas Gregg Holloway*, No. 3:02-cv-343-J20TEM (M.D. Fla. Apr. 12, 2002).  Due to their voluminous nature, Counsel has not attached these orders.  However, Counsel has both print and electronic copies of these orders immediately available for the Court and the Defendants, as needed.

private controversy is at stake." *CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008)

(quoting *Warner Holding*, 328 U.S. at 398); *Gem Merch.*, 87 F.3d at 469.  When enacting

Section 13(b), Congress intended to serve the public interest by protecting victims from

the effects of unfair and deceptive acts and practices "as quickly as possible." *FTC v.*

*World Travel Vacation Brokers*, 861 F.2d 1020, 1028 (7th Cir. 1988).

### B.    The FTC Meets the Applicable Standard for Injunctive Relief

Section 13(b) of the FTC Act allows a district court to enter a temporary

restraining order and a preliminary injunction in an FTC action "[u]pon a proper showing

that, weighing the equities and considering the [FTC's] likelihood of ultimate success,

such action would be in the public interest." 15 U.S.C. § 53(b).  In the Eleventh Circuit,

courts consider two factors in determining whether to grant a preliminary relief under

Section 13(b) of the FTC Act: (1) the likelihood that the FTC will ultimately succeed on

the merits; and (2) the balance of the equities. *See FTC v. Univ. Health, Inc.*, 938 F.2d

1206, 1217 (11th Cir. 1991); *FTC v. Para-Link Int'l*, No. 8:00-CV-2114-T-17TBM, 2001

U.S. Dist. LEXIS 17372 (M.D. Fla. Feb. 28, 2001).  Unlike private litigants, moreover,

the Commission "need not prove irreparable harm." *See Univ. Health*, 938 F.2d at 1218;

*Para-Link Int'l*, 2001 U.S. Dist. LEXIS 17372, at *14.

### C.    The FTC Is Likely to Succeed on the Merits

#### 1.    Defendants Have Engaged in Unfair Acts and Practices

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or

affecting commerce." 15 U.S.C. § 45(a).  A practice is unfair under Section 5 of the FTC

Act if it:  (1) causes or is likely to cause substantial injury to consumers; (2) the injury to

consumers is not outweighed by any countervailing benefits; and (3) the injury is not

reasonably avoidable by consumers.  *See* 15 U.S.C. § 45(n)[11]; *Orkin Exterminating Co. v.*

*FTC*, 849 F.2d 1354, 1363-64 (11th Cir. 1988); *FTC v. Neovi, Inc.*, No. 06-CV-1952-JLS

(JMA), slip op. at 10 (S.D. Cal. Sept. 16, 2008) (attached as **Exhibit D** in "Plaintiff's

Exhibits").

a.    Substantial Injury

As alleged in Counts 1 and 2, the advertising and sale of the RemoteSpy

keylogger, and the subsequent collection and publication of consumers' personal

information to unauthorized third parties, causes substantial injury to consumers.

RemoteSpy tracks a consumer victim's every move on his computer, including all

keystrokes typed, websites visited, applications used, and files and documents accessed

on that computer, and then organizes and discloses the consumer victim's personal

information, including bank account user names and passwords and other financial

information, to unauthorized third parties.  *See* Section III(D), *supra*.  This type of

information can be and has been used to economically injure consumers.  *See* Section

III(E), *supra*; *see also Neovi*, No. 06-CV-1952-JLS (JMA), slip op. at 10 (finding

substantial injury where unauthorized third parties had access to consumers' bank

---

[11] *See also* Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth,
Committee on Commerce, Science, and Transportation, United States Senate,
Commission Statement of Policy on the Scope of Consumer Unfairness Jurisdiction,
appended to *International Harvestor Co.*, 104 F.T.C. 949, 1064 (1984 )("Unfairness
Statement.")

account numbers and used them to create fraudulent checks).

Not only are consumers' finances at risk, but also their health and safety. Spyware of this type can be and has been used by stalkers and abusers to harm consumers. *See* Section III(E), *supra*; *see also FTC v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 U.S. Dist. LEXIS 74905 (D. Wyo. Sept. 28, 2007) (finding that the disclosure of consumers' phone records caused or was likely to cause substantial injury including unwarranted risk to their health and safety from stalkers and abusers).

In an unfairness action, it is irrelevant that the Defendants themselves did not send the harmful spyware to the consumer victims' computers. *See Neovi*, No. 06-CV-1952-JLS (JMA), slip op. at 10 (holding that the operators of the Qchex website, which allowed users to enter check and bank account information to create checks that could be sent to third parties, caused substantial injury to consumers who either received fraudulent checks or had their accounts fraudulently drawn on); *Accusearch*, 2007 U.S. Dist. LEXIS 74905 (holding defendants liable for obtaining and selling consumers' phone records despite fact that third party vendors, rather than the defendants, engaged in the deception to obtain the phone records); *see also In re C & D Elecs., Inc.*, 109 F.T.C. 72, 79 (1987) (the Commission found that the sale of cable television decoders, which allowed purchasers effectively to steal cable television signals, "fits the analytical framework that [the FTC has] established for our 'unfairness' jurisdiction").

b.    The Injury is Not Outweighed by Countervailing Benefits

Although there may be some benefits to software programs that allow this extensive monitoring of computer use (such as a parent monitoring a child's actions

- 14 -

online), such countervailing benefits exist only if the person who installs the software is

the owner or authorized user of the target computer. RemoteSpy, however, contains

features for enabling installation that are uniquely needed by someone who lacks

physical access to the computer, increasing the likelihood that RemoteSpy is installed

without an owner or authorized user's knowledge and consent.[12] *See* Good Dec. ¶¶ 43-

45. RemoteSpy is designed so that it can be sent to the target computer and installed as

an email attachment. *See* Section III(B), *supra*. Defendants provide instructions on how

to disguise the RemoteSpy executable as an attached innocuous file. *See id.* A parent or

other authorized user would be highly unlikely to need to remotely deploy disguised

spyware. On the contrary, a parent wishing to monitor her child's online activities would

almost certainly have physical access to the computer and be able to locally install a

parental monitoring software program.[13] Because Defendants' conduct "produces clear

---

[12] In a clear attempt to skirt liability, Defendants bury a purported "legal notice" deep within their website: "The execution of RemoteSpy on a computer you do not have rights of ownership too [*sic*] is illegal." Schools Decl. Att. 22. Similarly, on an entirely separate website (www.cyberspysoftware.com/license.html) that no purchaser is likely to ever see, a purported "license" – that makes no mention of RemoteSpy – notes: "You may only install this software on a computer that you own, or on a computer which you have consent of the owner to install this software." *Id.* at Att. 5. Obviously, one cannot avoid liability by employing a self-serving disclaimer for a product designed for illegal purposes. *See United States v. Gardner*, 860 F.2d 1391, 1395 (7th Cir. 1988) (sale of cable TV de-scramblers violates FCC Act despite defendant's notice disclaiming liability for illegal use); *Time Warner Cable v. Cable Box Wholesalers, Inc.*, 920 F. Supp. 1048, 1053 (D. Ariz. 1996). Despite these wink-and-nod disclaimers, Defendants' advertising and the very design of the product plainly indicate that RemoteSpy is meant to be deployed without the consent of the owner or authorized user.

[13] Even with a potentially legitimate use such as this, best practices dictate that parental monitoring software should be transparent to the computer user. *See* Southworth Decl. ¶¶ 54-56. However, for a parent who felt she had to resort to the more drastic measure of employing a surreptitious keylogger program to monitor her child, keyloggers are available that must be locally, physically installed. For example, without

adverse consequences for consumers that are not accompanied by an increase in services

or benefits" to them or the market as a whole, the second prong of the unfairness standard

is clearly met. *See FTC v. Windward Mktg.*, No. 1:96-CV-615-FMH, 1997 U.S. Dist.

LEXIS 17114, at *32 (N.D. Ga. Sept. 30, 1997).[14]

c.    The Injury is Not Reasonably Avoidable

Finally, the injury that the consumer victims suffer is not reasonably avoidable

because Defendants' practices are invisible to them.  A consumer's ability to reasonably

avoid injury depends on whether a consumer has a free and informed choice.  *See*

*Orkin*, 849 F.2d at 1365.  "'Consumers may act to avoid injury before it occurs if they

have reason to anticipate the impending harm and the means to avoid it, or they may seek

---

commenting on the legality of such conduct under the Wiretap Act, the Defendants
advertise and sell "CyberSpy," a less expensive keylogger that appears to require the user
to have physical access to the computer for installation and stores all the captured
information on the computer being monitored. *See* Schools Decl. Att. 6.  Although the
FTC does not condone the use of a locally installed keylogger that secretly records a
user's computer activities, that such devices must be installed by someone with physical
access to the computer, and the captured information is only disclosed locally, provides
at least some indicia that the person is an authorized user of the computer.  Defendants
have sold less than 400 licenses for this product as opposed to more than 13,000
RemoteSpy licenses. *See id.* at ¶ 29.

[14] An additional consideration in determining unfairness is whether an act or
practice violates public policy as established by statute. *See* Unfairness Statement
("[T]he Commission wishes to emphasize the importance of examining outside statutory
policies . . . for assistance in helping the agency ascertain whether a particular form of
conduct does in fact tend to harm consumers.").  The advertising, sale, and use of
RemoteSpy may violate federal criminal laws.  As discussed above, a federal grand jury
indicted the distributor and a number of users of the spyware Lover Spy, a remotely
installed keylogger that functioned similarly to RemoteSpy (and which Defendants claim
RemoteSpy "replaces,") for violations of the Wiretap Act and the Computer Fraud and
Abuse Act. *See* Section III(A), *supra*.  If conduct violates the spirit if not the letter of
federal criminal law, it is difficult to see how countervailing benefits could outweigh
injury under Section 5.

- 16 -

to mitigate the damage afterward if they are aware of potential avenues toward that

end.'" *Id.* (quoting *In re Orkin Exterminating Co., Inc.*, 108 FTC 263, 366 (Dec. 15,

1986). As mentioned, RemoteSpy fails to adhere to standard installation procedures and

can be impossible for the average consumer to detect and remove on his own. *See*

Section III(C), *supra.* The spyware silently installs and disguises itself in a hidden

directory on the consumer victim's computer and cannot be found where users would

ordinarily look for actively running programs. *See id.* Because the consumer victims are

unable to detect the installation or presence of RemoteSpy, they lack a free and informed

choice that would enable them to prevent RemoteSpy's installation and use, and the

injury that RemoteSpy causes is therefore not reasonably avoidable. *See FTC v. Seismic

Entm't Prods.*, No. 04-377-JD, 2004 U.S. Dist. LEXIS 22788, *12 (D.N.H. Oct. 21,

2004) ("Consumers are not able to avoid these problems because the defendants access

their computers, install software and programs, and make changes without the user's

knowledge or consent.").

> **2.    Defendants Have Provided Others with the Means and
>          Instrumentalities to Engage in Unfair and Deceptive Practices**

> a.    <u>Means and Instrumentalities</u>

Providing others with the means and instrumentalities to engage in unfair and

deceptive practices is itself a violation of Section 5. *See, e.g., Waltham Watch Co. v.

FTC*, 318 F.2d 28, 32 (7th Cir. 1963) ("Those who put into the hands of others the means

by which they may mislead the public, are themselves guilty of a violation of Section 5

of the Federal Trade Commission Act."); *Gellman v. FTC*, 290 F.2d 666 (8th Cir. 1961)

(citing *Peerless Prods., Inc. v. FTC*, 284 F.2d 825, 826-27 (7th Cir. 1960), *cert. denied*,

365 U.S. 844 (1961)); *C. Howard Hunt Pen Co. v. FTC*, 197 F.2d 273 (3d Cir. 1952);

*Globe Cardboard Novelty Co. v. FTC*, 192 F.2d 444 (3d Cir. 1951); *FTC v. Five-Star*

*Auto Club, Inc.*, 97 F. Supp. 2d 502, 530 (S.D.N.Y. 2000) (citing *Regina Corp. v. FTC*,

322 F.2d 765, 768 (3d Cir. 1963) ("One who places in the hands of another a means of

consummating a fraud or competing unfairly in violation of the Federal Trade

Commission Act is himself guilty of a violation of the Act.")).  It is immaterial to a

means and instrumentalities count whether the purchasers of Defendants' spyware were

themselves deceived. *See FTC v. Magui Publishers, Inc.*, 1991-1 Trade Cas. (CCH)

¶69,425 (C.D. Cal. 1991) (wholesaler violated FTC Act by supplying retailers with

reproductions of art that retailers sold to unsuspecting customers, even though retailers

themselves were not deceived).

        b.      <u>Means and Instrumentalities to Engage in Unfair Acts and
Practices</u>

      Defendants provide the RemoteSpy customers with harmful spyware, step-by-

step instructions and examples demonstrating how to remotely deploy the disguised

spyware, and access to consumers' personal information harvested by the spyware.  By

providing the RemoteSpy customers with harmful spyware and the tools needed to install

it on consumers' computers without their knowledge and authorization, Defendants have

provided the RemoteSpy customers with the means and instrumentalities to engage in

unfair practices. *Cf. Seismic Entm't Prods.*, 2004 U.S. Dist. LEXIS 22788, at *12

(granting motion for temporary restraining order where defendants' installation of

- 18 -

spyware without consumers' knowledge or consent, which negatively affected the

performance of consumers' computers and required significant time and expense to

uninstall, caused substantial injury).

          c.      <u>Means and Instrumentalities to Engage in Deceptive Acts or Practices</u>

       An act or practice is deceptive if:  (1) there was a representation; (2) the

representation was likely to mislead consumers acting reasonably under the

circumstances; and (3) the representation was material.  *FTC v. World Media Brokers,*

415 F.3d 758, 764 (7th Cir. 2005); *FTC v. Tashman,* 318 F.3d 1273, 1277 (11th Cir.

2003).  Defendants provide RemoteSpy customers with instructions and examples

demonstrating how to falsely represent to the consumer victims that the RemoteSpy

executable is an innocuous file or attachment, such as "photos" or "music."  The

RemoteSpy program is not an innocuous file or attachment; rather, it is spyware that

tracks a consumer's every move on his computer and discloses that information to

Defendants and unauthorized third parties.  This representation is likely to mislead

reasonable consumers who are deciding whether to click on the disguised icon.  Given

the express nature of the representation, which concerns the core functionality of the

software code and the very essence of the product, the misrepresentation is presumed to

be material.  *FTC v. Cyberspace.com,* LLC, 453 F.3d 1196, 1201 (9th Cir. 2006)

(explaining that a representation is material if it "involves information that is important

to consumers and, hence, likely to affect their choice of, or conduct regarding, a

product.") (citing *Cliffdale Associates, Inc.*, 103 F.T.C. 110, 165 (1984)).  Consumers

would not click on the disguised icon if they knew that the result would be to install a spyware program that records their every move on their computer and reveals their personal information to others.

Defendants provide the means and instrumentalities to deceive consumers when they supply the RemoteSpy customers with step-by-step instructions, including screenshots and examples, demonstrating how to falsely represent the nature of the RemoteSpy executable to the consumer victims. Defendants also teach the RemoteSpy customers techniques for delivering the RemoteSpy executable to consumer victims' remote computers via email, including how to falsely represent that the disguised executable is part of a Microsoft Word document. *See* Section III(B), *supra.* Accordingly, Defendants have provided RemoteSpy customers with the means and instrumentalities to engage in deceptive acts or practices. *See FTC v. Bryant*, No. 3:04-cv-897-J-32MMH, 2004 U.S. Dist. LEXIS 23315 (M.D. Fla. Oct. 4, 2004) (enjoining defendants from providing the means and instrumentalities to deceive where defendants had provided customers with deceptive brochures and sample advertisements, instructed them to place the sample ads in newspapers and magazines, and to send the misleading brochures to consumers who responded to the ads).

### 3.   The Individual Defendant Should Be Held Liable for Injunctive and Monetary Relief

The Commission is likely to succeed in demonstrating that defendant Tracer Spence is individually liable for CyberSpy Software's unfair and deceptive practices described above.[15] Individual owners and officers may be held liable for injunctive relief

---

[15] *See* Section III, *supra.*

and disgorgement if they: (1) either participated directly in or had some measure of control over the challenged practices; and (2) had or should have had some knowledge or awareness of those practices. *See Gem Merch.*, 87 F.3d at 470; *World Media Brokers, 415 F.3d at 764; FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997); *FTC v. Medicor, LLC*, 217 F. Supp. 2d 1048, 1055 (C.D. Cal. 2002). The FTC "is not required to prove subjective intent to defraud." *World Media Brokers*, 415 F.3d at 764; *see also FTC v. Freecom Commc'ns, Inc.*, 401 F. 3d 1192, 1204 (10th Cir. 2005); *Amy Travel*, 875 F.2d at 573-74. This standard has been applied to determining the individual liability of limited liability company members, as well as corporate officers and directors. *In re National Credit Mgmt. Group, L.L.C.*, 21 F. Supp. 2d 424, 461 (D.N.J. 1998).

Spence's status as the registered agent, manager and purported CEO of CyberSpy Software gives rise to a presumption of ability to control CyberSpy Software. *See Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *39; *World Media Brokers, 415 F.3d at 764-65 (corporate officer "hard-pressed to establish that he lacked authority or control" over corporate entity); *Amy Travel*, 875 F.2d at 574; *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir.), *cert. denied*, 414 U.S. 828 (1973) ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation[.]"); *Publ'g Clearing House, Inc.*, 104 F.3d at 1170-71 (defendant's role of President and authority to sign documents on behalf of the company show that she had requisite control over it for individual liability). Direct participation in the wrongful conduct is not a requirement for liability; rather, awareness of the wrongful conduct and

- 21 -

failure to act within one's authority to control such practices is sufficient to establish liability. *See Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *39-40.

Participation in business affairs is probative of knowledge. *Publ'g Clearing House*, 104 F.3d at 1170-71; *FTC v. Affordable Media, L.L.C.*, 179 F.3d 1228, 1235 (9th Cir. 1999); *Amy Travel*, 875 F.2d at 574. Because Spence is a manager, registered agent, and purported CEO of CyberSpy Software, and has owned and resided at CyberSpy Software's address since 2005, Spence's knowledge of CyberSpy's unfair and deceptive business practices can be presumed. Because Spence has the authority to control, participate in, profit from, and must know about the corporate Defendant's wrongful acts, he should be enjoined from violating the FTC Act and ordered to disgorge ill-gotten gains received in connection with the companies' activities. Preliminary relief, therefore, is appropriate against Spence as well as the corporate defendant to protect the unsuspecting victims and preserve the Court's ability to impose effective permanent relief.

**D.     The Balance of Equities Tips in the Commission's Favor**

Not only is the Commission likely to succeed on the merits, but the balance of the equities also tips decidedly in the Commission's favor. In balancing the equities, the Court must assign greater weight to the public interest than to any of Defendants' private concerns. *World Travel*, 861 F.2d at 1029; *see also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981) (private equities alone insufficient to justify denial of injunction). The public equities in this case are compelling, as the public has a strong interest in immediately halting an unfair and deceptive practice affecting thousands of

consumers. Defendants, by contrast, lack any legitimate interest that would be infringed

by the requested injunction. *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347

(9th Cir. 1989) ("[T]here is no oppressive hardship to defendants in requiring them to

comply with the FTC Act [or] refrain from fraudulent representation[s]."); *Para-Link*

*Int'l*, 2001 U.S. Dist. LEXIS 17372, at *16-18 (recognizing that the public interest in

preventing the sale of deceptive work-at-home business opportunity outweighs any harm

to promoters of the opportunity, their employees, and independent contractors).

E.    **A Temporary Restraining Order Requiring Defendants to Cease the Challenged Conduct Is Necessary to Prevent Further Substantial Injury**

The FTC seeks a temporary restraining order enjoining the challenged practices,

prohibiting Defendants from disclosing or benefitting from the use of the consumer

victims' personal information obtained through RemoteSpy, and requiring Defendants to

ensure that www.remotespy.com and information collected by RemoteSpy is preserved

but cannot be accessed by third parties, in order to prevent further substantial injury to

the public.[16] This relief is authorized by Section 13(b) of the FTC Act in conjunction

with Fed. R. Civ. P. 65, and is necessary and appropriate in this case.

Without the entry of the proposed temporary and preliminary injunctive relief,

Defendants will continue to engage in their unfair and deceptive marketing and sale of

spyware and injure the public during the pendency of the litigation. Defendants have

been in business since at least late 2005, engaging in the same unfair and deceptive

_____

[16] The proposed TRO is narrowly tailored to stop the illegal conduct. The FTC may seek additional relief at the preliminary injunction stage, including requiring some form of notice to the consumer victims. Without such notice, the consumer victims will be unable to take the necessary precautions to protect themselves from further injury.

practices unabated, despite knowledge of the dubious legality of their practices.  As

stated above, it is likely that more than 13,000 computers are infected with the

RemoteSpy spyware.  Defendants' rampant use of unfair and deceptive practices "gives

rise to the inference that there is a reasonable likelihood of future violations." *SEC v.*

*R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 877 (S.D. Fla. 1974) (citations omitted); *see*

*also CFTC v. Hunt*, 591 F. 2d 1211, 1220 (7th Cir.), *cert. denied*, 442 U.S. 921 (1979)

(past misconduct is "highly suggestive of the likelihood of future violations").

## V.    CONCLUSION

Defendants have engaged in, and continue to engage in, practices that are unfair and deceptive in violation of Section 5 of the FTC Act.  To prevent any further injury to innocent victims of spying, the Commission respectfully requests that the Court grant its motion for a narrow temporary restraining order enjoining Defendants from spying on unsuspecting victims, and other equitable relief, and order to show cause why a preliminary injunction should not issue.

Dated: November 4, 2008

Respectfully submitted,
WILLIAM BLUMENTHAL
General Counsel


DAVID K. KOEHLER
NY Bar. No. 2651404
TRACY R. SHAPIRO
CA Bar No. 220811
TRIAL COUNSEL
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Mail Drop NJ-3212
Washington, D.C.  20580
TEL.: (202) 326-3627 (Koehler)
        (202) 326-2343 (Shapiro)
FAX: (202) 326-3259
Email: dkoehler@ftc.gov
        tshapiro@ftc.gov
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on November 4, 2008, I caused true and correct copies of the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFF FTC'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** to be served by Federal Express, Priority Overnight, upon the following:

**CyberSpy Software, LLC**
1512 East Jefferson Street
Orlando, FL 32801

**Tracer R. Spence**
1512 East Jefferson Street
Orlando, FL 32801

_____
David K. Koehler