**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**FEDERAL TRADE COMMISSION,**

       **Plaintiff,**

  **v.**                       **Case No:  6:08-cv-1872-ORL-31GJK**

**CYBERSPY SOFTWARE, LLC and**
**TRACER R. SPENCE,**

       **Defendants.**

_____/

**MOTION TO VACATE OR MODIFY TEMPORARY RESTRAINING ORDER AND**
**RESPONSE TO ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION**
<u>**SHOULD NOT BE GRANTED**</u>

      Defendants CyberSpy Software, LLC ("CyberSpy"), and Tracer R. Spence ("Mr.

Spence") (collectively "Defendants"), by and through undersigned counsel, hereby moves the

Court for an order vacating or modifying the Temporary Restraining Order ("TRO") and

responds to the Order to Show Cause Why a Preliminary Injunction Should Not Be Granted,

and in support thereof, states as follows:[1]

**I.**    <u>**INTRODUCTION**</u>

      After months of investigation, the Federal Trade Commission ("FTC") has corralled

its vast resources to target Defendant CyberSpy, a small, locally owned, software company,

and its sole employee, Defendant Tracer Spence.  CyberSpy is the maker of a software

---

[1] Defendants have filed the following affidavits/declarations in support of this Motion:  Declaration of Toni-Marie Catchpaw ("Catchpaw ¶ ___"); Declaration of Steve Aspery ("Aspery ¶ ___"); Declaration of Jack Sumner, Jr. ("Sumner ¶ __"); Declaration of S. Brannon PhD ("Brannon ¶ __"); Declaration of Barbara Abel ("Abel ¶ __"); Declaration of Erik Laykin ("Laykin ¶ __"); Affidavit of Tracer Spence ("Spence ¶ __"); and Affidavit of Michele L. Johnson, Esq. ("Johnson ¶ __").  Further, in this Motion, Defendants may refer to some of the FTC's evidence including the Declaration of Nathaniel Good ("Good ¶ __") (Dkt. 2); Declaration of Cindy Southworth ("Southworth ¶ __") (Dkt. 2); Declaration of Sallie Schools ("Schools ¶ __") (Dkt. 2); and Declaration of David Koehler ("Koehler ¶ __") (Dkt. 4).

program known as RemoteSpy (the "Target Product").  The Target Product is a type of

monitoring software commonly referred to in the marketplace as  remote keylogger

software.[2]   The FTC has singled out the Defendants and seeks to permanently enjoin the

continued sale, distribution and functionality of the Target Product by making histrionic

claims that the "public" is being "victimized" by the Target Product, which they improperly

characterize as "unlawful."[3]    Specifically, the FTC seeks to have an injunction entered

against the Defendants which would: 1) enjoin the Defendants from marketing and selling

the Target Product; 2) enjoin the Defendants from disclosing any information obtained

through the operation of the Target Product; 3) freeze all of Defendants' assets, including,

but not limited to, all bank accounts, credit cards, real and personal property; and 4) enjoin

the Defendants from operating any new business without notifying the FTC.  *See* Proposed

FTC Injunction (Dkt. 19).  This far reaching punitive remedy is being sought because the

FTC *speculates* that the Target Product is being used by some unknown and unidentified

"perpetrators" to steal the identities of and "wreak havoc" on the finances of unknown and

unidentified "consumers[4]."  The FTC's conjecture continues when, without any evidentiary

support, it alleges that the Target Product has been "used by stalkers and abusers" to terrorize

unnamed victims of domestic abuse.  *Id.*

   While the FTC's allegations are fraught with nefarious allegations designed to appeal

to our passions of fear and sympathy, they are short on detail and substance.  Indeed after

months of investigation, the FTC has not identified a single victim or described a single

incidence where the Target Product caused harm to anyone.  Instead, the FTC relies on

---

[2] *See* FTC definition of "Remotely deployed keylogger," TRO p. 4, ¶ 10.
[3] *See* FTC's Memorandum In Support of Plaintiff FTC's Motion for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, p. 2.  (Dkt. 3) (the "FTC Memo.")
[4] FTC Memo, p. 10, 13-14.

vagaries and generalities to support its position that the Defendants should be permanently put out of business because the Target Product (like most software products) is *capable* of being abused by unknown individuals in a manner which could cause harm to unknown victims.  In doing so, the FTC ignores the fact that the Target Product has never been accused of being used by anyone to commit any of the offenses described in the FTC Memo.

Although the FTC implies that the sale of the Target Product is "unlawful[5]" the truth is that the Target Product, like all remote keylogger software, is a legal product that the FTC has never sought to regulate through its vast rule-making authority.  Indeed, remote keylogger software has been available in the marketplace since at least 1998 and is commonly used by the consuming public for a variety of beneficial uses.  For example, parents use these products to monitor the computer usage of their children in an effort to protect them from the variety of dangers that exist on the internet.  Additionally, such products are used by employers who wish to monitor the computing activity of their employees to insure against the theft of trade secrets, embezzlement and other illegal/illicit activities of their employees.  Conveniently, the FTC Memo makes no mention of these well known beneficial uses.

Given the beneficial uses, remote keylogger software products are widely available in the marketplace.  The Target Product is one of many available remote keylogger software products.  In fact, the Target Product's market share is less than 3 to 4%, in an ever growing marketplace which is being saturated by competitive remote keylogger software products. For example, since 2004 the Defendants have sold only 11,138 licenses for the Target

---

[5] FTC Memo, p. 2.

Product[6] as compared to a competitor of CyberSpy who claims that its product has been used by "hundreds of thousands of people across the globe."  Despite this, the FTC has singled out the Target Product and has taken no action against the remaining 97% of the marketplace for such products.  As such, it is unclear why the FTC targeted a product with such a small market share and how the FTC's stated goal of "protecting the general public" from being "victimized" by such products will be accomplished in this proceeding.  Indeed, if the FTC's requested injunction is entered, the only outcome will be the destruction of Defendants' business and livelihood with no corresponding reduction of availability of remote keylogger software products in the marketplace since Defendants' competitors will undoubtedly fill the small void left by the disappearance of the Target Product.

Finally, contrary to the FTC's unsupported assertion, remote keylogging software products, like the Target Product, are not typically used by perpetrators to commit identity theft.  To the contrary, the undisputed record evidence shows that such products are not well designed for and are too risky for the efficient use by identity thieves.

## II.    FACTS

### A.    The Defendants

CyberSpy Software LLC is a small, locally owned, software company.  CyberSpy's sole employee is its CEO, Tracer Spence.  Mr. Spence created the Target Product along with his former business partner in 2004, and he formed CyberSpy in 2005.  Spence ¶ 4.  Since 2005, CyberSpy has sold 11,138 licenses of the Target Product which typically generate a couple hundred thousand dollars ($200,000.00) in gross revenues each year.  Spence ¶ 20.

---

[6] In his Declaration, Mr. Koehler incorrectly states that 13,000 licenses have been issued for the Target Product. Koehler ¶ 7.  However, that number appears to include licenses which were cancelled due to returns and refunds.

The Target Product accounts for more than 99% of the revenues generated by CyberSpy and
is Mr. Spence's sole means of personal financial support.  Spence ¶ 21.

**B.     The Target Product**

The Target Product is RemoteSpy, a remote keylogging software product that is
capable of monitoring a full range of computing activities on the computer on which it is
installed.  Like many monitoring solutions available in the marketplace, the Target Product
may (at the licensee's option) be remotely installed on a computer without the computer
user's knowledge.  Spence ¶ 17.  A successful installation of the Target Product requires that
licensee run the Target Product through a configuration process that creates and executable
file ("·exe file") containing the Target Product and download the file onto a computer whose
anti-virus software does not prevent such action.  Spence ¶ 5, 6.  The module containing the
Target Product can be customized such that the computer user could download the product
without realizing what the file contains.  Once successfully installed the Target Product will
generate monitoring logs which can be reviewed by the customer anywhere.  Spence ¶ 5.  In
order to obtain a copy of the Target Product, a customer must agree to the terms of a License
Agreement and their use of the Target Product is governed by the license.  Spence ¶ 10;
Schools, Attachment 5.  For this reason, customers of the Target Product are often referred to
as "licensees."  According to the terms of the License Agreement, a customer may only
install the Target Product "on a computer that **you** own, or on a computer from which you
have **consent of the owner** to install this software."  Spence ¶ 10; Schools Attachment 5.
The License Agreement further directs that, "[b]y installing, running, or using any CyberSpy
product or service you agree to the above policies."  *Id.*  Indeed, even the FTC investigator,
Sallie Schools, acknowledged that she had to agree to the terms of the License Agreement

before she was permitted to purchase the Target Product.  Schools ¶ 8.  Likewise, the

Defendants' website contains dozens of warnings[7] that the Target Product should only be

used on "your" (the potential customer's) computer.  Spence ¶ 12; School, Attachment 12.

For example, the Defendants' webpage provides the following information about the Target

Product:  "Powerful Remote features gives [sic] you full control over monitoring **your**

computer secretly from anywhere in the world."  Spence ¶ 12.  Further, the installation guide

contained on the Defendants' website contains the following warning:  "**Legal Notice:**  The

execution of RemoteSpy on a computer you do not have rights of ownership too [sic] is

illegal.  Sending an application to a PC to maliciously record data without the owners [sic]

consent is illegal.  RemoteSpy will not take responsibility for actions taken after your

purchase.  You must abide by all state and federal laws while using RemoteSpy monitoring

software."  Spence ¶ 12.  To the Defendants' knowledge, with rare exception, customers of

the Target Product abide by the warnings contained on their website and to the terms of the

License Agreement.  Spence ¶ 10.

### 1.      Common Beneficial Uses of the Target Product

Although the FTC chooses to focus exclusively on the rare nefarious and illegal

*potential* uses of the Target Product, the undisputed evidence shows that the Target Product

provides an invaluable tool to its users.  The Target Product is most frequently used by

parents wishing to monitor the computer activity of their children.  Spence ¶ 7.  As a result of

the Target Product, concerned parents were able to intervene in potentially dangerous

situations and protect their children.  For example, as set forth in the affidavit of Jack

---

[7] Conveniently, the FTC investigator, Sallie Schools only attached selected print outs from the Defendants' website.  Unfortunately, because the FTC took steps to disable the Defendants' website (even though all references to the Target Product had been eliminated immediately after the TRO was issued), Defendants do not have the ability to print out their complete website and provide to the Court.

Sumner, the Target Product informed him of his three children's potential exposure to and/or participation in pornography, drugs and underage sex.  Sumner ¶ 3, 6, 7-9.  Likewise, Toni-Marie Catchpaw's use of the Target Product allowed her to discover her 16 year-old son's drug usage in time for her to act and intervene.  Catchpaw ¶ 2-3.  In fact, Ms. Catchpaw credits the Target Product with saving her son's life "on several occasions" by allowing her "to be informed enough to know that he had done a lethal amount of street drugs [so that she] was able to get him to the hospital before his heart stopped."  Catchpaw ¶ 3.  According to Ms. Catchpaw:  "If it was not for RemoteSpy, my son would be dead.  This is truly important software that serves a purpose to parents of troubled teens."  Catchpaw ¶ 5.  Likewise, Barbara Abel's use of the Target Product allowed her to monitor her 12 year-old daughter's computer communications with potentially dangerous strangers in time for her to act and intervene.  Abel ¶ 4.  Indeed, the record is replete with specific examples of how concerned responsible parents used the Target Product to protect their children from dangerous people or conduct.  *See, e.g.* Sumner ¶ 5-9; Catchpaw ¶ 3-5; Brannon ¶ 2; Spence ¶ 7, and Abel ¶4.

Another salutary use of the Target Product is the assistance it provides to employers wishing to keep track of their employees' computer practices.  Spence ¶ 8.  The undisputed record evidence reveals that the Target Product is credited with allowing employers discover and prevent employees from engaging in a host of illegal and/or inappropriate conduct, such as stealing company property and misappropriating trade secrets.  Spence ¶ 8.  By way of example, consider the testimony of Steve Aspery, who deployed the Target Product to monitor his employees and discovered that one of them was working with his competitors.  Aspery ¶ 3-6.  In that instance, not only did the Target Product expose damaging employee behavior, but the information collected by the Target Product was used to successfully

defend against a wrongful termination lawsuit filed by that employee.  Aspry ¶ 7.  The remote install capability of the Target Product is critical for employers seeking to monitor the computer usage of the growing number of employees who telecommute or frequently travel.

Further, physicians use the Target Product to insure that their employees are complying with privacy and information control regulations such as HIPAA.  Spence ¶ 9; Brannon ¶ 3.  Additionally, the Target Product has been used to retrieve lost data, such as passwords, following a computer crash.  Abel ¶ 5.  Customers of the Target Product have described the product as "provid[ing] and invaluable service" (Abel ¶ 7);  a "critical program for allowing me to parent and protect my children" (Brannon ¶ 2); as having "many benefits to assist professionals and the public" (Brannon ¶ 4); as having "proved its value" (Aspery ¶ 8); as giving parents "peace of mind" (Catchpaw ¶ 6); and allowing parents to act "responsibly" (Sumner ¶ 10).  As such, unlike the FTC's vague and generic speculations about the *possible* ways that the Target Product may be used, the record evidence is rife with specific examples from identifiable witnesses who extol the virtues of the Target Product.

### 2.    Defendants' Efforts to Prevent Abuse

While the Target Product clearly and indisputably has numerous beneficial and legitimate uses, like most software products, the potential for abuse exists.  Laykin, ¶ 18, 19.  Obviously, the Defendants cannot control the behavior of its customers.  However, the Defendants take steps to prevent abuse of the Target Product.  First, as outlined above, before anyone is permitted to purchase the Target Product, they must agree to comply with the terms of a License Agreement which requires that the Target Product only be installed on computers that the customer owns or has consent of the owner to install such software on.  Schools, Attachment 5; Spence ¶ 10.  The License Agreement is reinforced by the Target

Product's website which makes clear to its customers that the software is to only be installed on "**your**" computer.  Schools, Attachment 12.  Further, the e-commerce platform used by the Defendants to sell the Target Product features a variety of fraud prevention measures to detect and prevent potential purchases from individuals participating in criminal activity.  Spence ¶ 13.

Despite these safeguards, the Target Product, like many products, can be abused by people who ignore the terms of the License Agreement and violate the law.  However, such incidents are very rare.  Since 2004, the Target Product has only been involved in four (4) criminal investigations.  Spence ¶ 15.  Of those four, only two (2) (described below) involved claims that the Target Product was misused.  *Id.*  In each investigation, the Defendants did everything requested of them by law enforcement.  Spence ¶15.  For example, when the Defendants learned that the Target Product was being misused by a City Councilman in Greenville, South Carolina to monitor the computers of other city employees, Defendants assisted law enforcement authorities.  Spence ¶ 15.  Likewise, Defendants assisted law enforcement in its investigation of a criminal complaint brought by an ex-husband who suspected that his ex-wife used the Target Product to spy on him.  *Id.*  To the Defendants knowledge the Target Product has **never** been used to commit identity theft or to stalk and/or terrorize victims of domestic abuse.  Spence ¶ 16.

### C.     Competitive Products

Even if the FTC could produce credible evidence that the Target Product was used to facilitate criminal activity (which it hasn't), the elimination of the Target Product from the marketplace would not accomplish the FTC's stated goal of protecting the "public" from the "harm" caused by remote keylogging products.  As indicated above, the Target Product

enjoys annual gross sales of only $200,000.00 and accounts for a mere 3-4% of the marketplace of remote keylogger products[8].  Spence ¶ 20.  The Target Product occupies a small portion of the market which is cluttered with many products which possess the same functionality (such competitive products will hereinafter be collectively referred to as the "Competitive Remote Keylogger Products"[9]).  Spence ¶17.  All of these products are functionally identical to the Target Product and they advertise the same features and capabilities on their websites.  Spence ¶ 17; Laykin ¶ 21.

Further, the Competitive Remote Keylogger Products are promoted on websites with content which is similar to the websites associated with the Target Product that the FTC found so objectionable[10].  Each of these websites contain content  promoting the same functions of the Target Product which the FTC found so "dangerous" that it launched its three month investigation targeted at the destruction of the company with the smallest market share, while leaving the balance of the market in tact.

Specifically, the FTC objected to the Defendants promotional materials which claimed that the Target Product allowed customers to "spy on anyone, from anywhere;" instructed customers on how to "disguise the executable spy module;" is "100% Undetectable" with "Powerful Security Features,"  "Unbeatable Stealth Capabilities" and

---

[8] The Defendants' competitors represent the overwhelming lion's share of the market, not just in terms of the amount of gross revenue generated by the sale of such product, but also in terms of their size, product portfolio and overall revenue.  Spence ¶ 20.  For example, Spectorsoft, the maker of a Competitive Remote Keylogger Product known as eBlaster, has ranked among the 500 fastest growing companies in America by Inc. Magazine with report annual revenue of more than $15.5 million.  Id.

[9] Competitive Remote Keylogger Products include such products known as:  SniperSpy (available from www.sniperspy.com), Realtime Spy (www.realtime-spy.com), SpyAgent (www.spytech-web.com/spyagent.shtml), eBlaster (www.spectorsoft.com), iSpynow (www.i-spynow.com) and WebWatcher (www.awarenesstech.com).  Spence ¶ 17.

[10] *See* Johnson ¶ 9-15, Exhibits 3-18 (describing promotion of the "Spytech Software Lineup" which includes products such as SpyAgent, SpyAnywhere and SpyAgent/SpyAnywhere Remote Monitoring Stealth Suite, as well as Realtime-Spy); ¶ 20-26, Exhibits 22-26 (describing the iSpyNOW product); ¶ 29-31, Exhibits 27-30 (describing the SniperSpy product); ¶33 (a), Exhibits 32-38 (describing the eBlaster product) ¶ 33(b), Exhibits 39-42 (describing the SniperSpy product); ¶ 33(c), Exhibits 43-48 (describing the InvisibleKeylogger product); ¶ 33(d), Exhibits 49-57 (describing the WebWatcher product).

"Cloaking Ability" which will not be stopped by a "firewall" and collects a variety of private

information.  FTC Memo pp. 4-9.  However, by way of comparison, the websites associated

with the Competitive Remote Keylogger Products contain the same "dangerous" claims

including advertising the respective products' remote deployment, stealth invisibility, and

detection-free operation capabilities.  *See* Johnson ¶34-36 and Exhibits 35 (wherein eBlaster

promotes its "Stealth Technology"), 38 ("Remote Installation" information for eBlaster), 40

(wherein SniperSpy advertises that "[u]nlike the other remote spy titles on the market **Sniper**

**Spy fully and completely bypasses the Windows XP Firewall**." (emphasis in original)), 42

(wherein SniperSpy advertises that the "covert software can be installed AND uninstalled

remotely[,]" "[a]llows you to install the software from any location using a simple file you

easily create[,]" and allows the purchaser to "select whether or not the remote user will be

notified that they are being monitored."), 54 (advertising that "WebWatcher monitoring

software can't be seen on or turned off by anyone except you.  And you don't have to worry

about firewalls software because our software is hidden to many popular programs currently

available."), and 57 (advertising WebWatcher's "Unparalleled Invisibility Technology" as

"WebWatcher doesn't appear ANYWHERE.  No one will ever know it's there" and that

"Anti-virus, anti-spyware, and firewalls can't stop it").  Interestingly, the www.ispynow.com

website advertises its product, the InvisibleKeylogger remotely deployable keylogger

software product, see Exhibits 43 through 48, in a manner **nearly identical** to that of

www.remotespy.com, yet it continues to be available on the Internet.  Despite this, the FTC

chose to single out the Target Product while leaving the lion share of the market "open for

business."   As such, the stated goals of the FTC will not be met by the issuance of the

requested injunction.

### III.    STANDARD

Granting or denying injunctive relief is a decision within the discretion of the Court. *Carillon Importers, Ltd. v. Frank Pesce International Group Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997).  Nevertheless, injunctive relief is an "extraordinary remedy" which should only be granted if the movant carries the burden of persuasion on its claims.  *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F. 3d 1205, 1210 (11th Cir. 2003).  As an incident to the authority Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), grants this Court to enter a permanent injunction, the Court may also enter a preliminary injunction in favor of the FTC.  *FTC v. FTN Promotions, Inc.*, No. 8:07-CV-1279-T-30TGW, 2008 WL 151888, at *6 (M.D. Fla. Jan. 15, 2001).

When determining whether to grant a preliminary injunction in favor of the FTC, "a Court must consider the likelihood that the Federal Trade Commission will succeed on the merits, and, must balance the equities involved."  *FTC v. Para-Link Int'l, Inc.*, No. 8:00-CV-2114-T-17TBM, 2001 WL 1701537, at *5 (M.D. Fla. Feb. 28, 2001) (citing *FTC v. University Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991)).  When it seeks a preliminary injunction, the FTC is not required to prove irreparable damages, but must nevertheless show that the violations complained of are continuing, or likely to continue.  *Id.*  Further, under the express terms of Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), the entry of a preliminary injunction must be in the public interest.  *See FTN Promotions, Inc.*, 2008 WL 151888, at *6.

### IV.    ARGUMENT

The FTC's inability to demonstrate a likelihood of success on the merits begins with the fact that it will not be able to prove that it has standing to bring this action.  Assuming that the FTC manages to clear the standing hurdle, its problems continue with its inability to

present any evidence that the Defendants violated Section 5 (a) of the Federal Trade

Commission Act, 15 U.S.C. § 45 (a) (the "FTC Act"), which prohibits "unfair and deceptive

acts or practices in or affecting commerce." The experts employed by the FTC admit that the

information provided by the Defendants about the Target Product is accurate. Good, p. 35--

Conclusions (a) and (b). As such, by its own admission, the FTC acknowledges that the

Defendants have not made any misrepresentations or material omissions. To get around this

glaring deficiency, the FTC creates its far-fetched theory that, by accurately describing the

functionality of the Target Product, the Defendants are providing their *consumers* (which the

FTC Act is intended to protect) with the "means and instrumentalities" to deceive unknown

third parties. Unfortunately for the FTC, even if their theory could be proven, it is not and

cannot be considered a violation of the FTC Act. Finally, even if the FTC manages to

squeeze its contorted theory into a possible violation, it will not be able to show that the

alleged acts of the Defendants are "unfair" or "deceptive." Finally, the FTC has not met and

cannot, meet its burden for obtaining injunctive relief.

### A.     The FTC Has Not Demonstrated and Cannot Demonstrate a Likelihood of Success on the Merits

#### 1.     The FTC Lacks Standing to Bring this Action.

Obviously before the Court even considers the FTC's requested injunction, the FTC

should be required to prove that it has standing to bring this action. As set forth in

Defendants' Motion for Summary Judgment, filed simultaneously herewith and incorporated

herein by reference, the FTC lacks standing to bring this action because: (1) it cannot show

any actual or imminent harm, (2) there is no causal connection between the alleged injury

and the challenged action of the Defendants, and (3) the alleged harm will not be redressed

by the FTC's requested injunction. In support of this position, and to avoid unnecessary

duplication, Defendants refer the Court to their Motion for Summary Judgment, Section IV A (1), (2) and (3) which is incorporated herein by reference.

### 2.     FTC Has Not and Cannot Prove a Violation of the FTC Act

Even if the FTC manages to prove that it has standing, the undisputed evidence shows that that the Defendants did not commit any act which would constitute a violation of the FTC Act.  Essentially the FTC Act, and the case law interpreting it, make clear that a defendant cannot be liable for acts of which it has no knowledge, committed by third persons over which it has no control.  To avoid unnecessary duplication, Defendants refer the Court to Section VI (B) (1) and (2) of their Motion for Summary Judgment, filed simultaneously herewith and incorporated herein by this reference.

### 3.     The FTC Has Not and Cannot Show Substantial Injury to Consumers

The FTC acknowledges that it must prove that the alleged violation causes or will likely cause substantial injury to consumers.  FTC Memo, p. 13.  The FTC attempts to satisfy this burden with the wholly conclusory allegation that the advertising and sale of the Target Product "causes substantial injury to consumers[,]" FTC Memo, p 13.  In an attempt to support this unfounded conclusion, the FTC relies solely on the declarations of Nathaniel Good, Ph.D. and Cindy Southworth, MSW.  The FTC suggests that these two declarations show that the Target Product causes injury to consumers' finances, health and safety.

According to the FTC, Dr. Good has concluded that the Target Product "collects a staggering amount of personal information that it organizes and shares with unauthorized third parties." FTC Memo, p 10.  However, although Dr. Good and his unnamed assistant, beginning on August 20, 2008, undertook to "test and analyze" the Target Product, there is no evidence whatsoever as to any injury, much less substantial injury, to *any* consumers as a

result of use of the Target Product.  Indeed, after months of "testing" and "investigations" all

the FTC can and does conclude from Dr. Good's declaration is that "a *potential* identity thief

*could* wreak havoc on a consumer's finances" with the type of information obtained with The

Target Product.  FTC Memo, p. 10.  Dr. Good's conclusions can be easily applied to

numerous products on the market, such as binoculars, cellular phone cameras and telescopic

lenses, all of which can be misued to steal information.  Laykin, ¶ 19.

Further, nowhere in his declaration does Dr. Good provide any evidence of any

"unauthorized third parties[]" or "identity thief" actually using the Target Product to "wreak

havoc" on any consumer's finances.  Rather he simply concludes that the Target Product

"performs all of the functions" that it is intended to perform, none of which are in and of

themselves linked to any harm to any consumer.  Good, p. 35.  Similarly, the FTC claims that

Ms. Southworth has "opined that keylogger spyware can and has been used by stalkers and

abusers to harm consumers, including significant emotional and physical injury."  FTC

Memo, p. 10.  Yet, just as with Dr. Good, Ms. Southworth provides no evidence whatsoever

in her declaration as to any injury, much less substantial injury, to *any* consumers as a result

of use of the Target Product[11].

The FTC does not even manage to supply credible evidence about the means and

methods by which the crime of identity theft is typically committed.  This is because logic

dictates that the Target Product is far from the ideal tool for individuals wishing to engage in

---

[11] The "opinions" of Ms. Southworth are nothing more than naked conjecture dressed up as expert testimony. To support her emotionally charged conjecture, Ms. Southworth describes a handful of "personal interviews" that she conduced with unnamed victims of domestic abuse, who themselves speculate that they were harmed by some unnamed spyware product.  As further "support" Ms. Southworth then refers to several news accounts, which she misinterprets as additional evidence of the dangers of spyware.  Ms. Southworth's indictment of all spyware products concludes with her wholly unsubstantiated opinion that spyware can be used to commit identity theft, a field which she doesn't claim to have any expertise in.  For these and other reasons, Ms. Southworth's declaration should be stricken as set forth in Defendants' Motion to Strike Declaration of Cindy Southworth, filed simultaneously herewith and incorporated herein by reference.

identity theft.  The successful use of the Target Product to commit such a crime requires that

the identity thief target a specific individual computer user (as opposed to a database

containing a large collection of personal information) in hope that the individual computer

user actually installs the software product on to a computer system which contains personal

information and does not have an anti-virus program that is capable of detecting such

software.  Software products, such as the Target Product are expensive, costing

approximately $100 per license, which could be "wasted" should any one of the

contingencies listed above not occur.  Further, had the FTC consulted with an expert in the

field, like defense expert Erik Laykin, it would have learned that commercial spyware

products, like the Target Product, are not used to commit identity theft by the vast majority of

criminals who engage in this behavior.  As explained by Mr. Laykin, who has investigated

identity theft incidents for a number of Fortune 500 companies, organized criminal gangs,

who are responsible for the vast majority of successful attacks resulting in data theft and

personal identity theft throughout the world, write their own software programs which are

specifically designed to attack predefined targets known to contain large databases of

personal information.  Laykin ¶ 11, 20.  Products such as the Target Product are not effective

or practical for perpetrators of identity theft for the following reasons:  (1)  the Target

Product is not economically viable since it  must be installed one computer at a time (at a

cost of $100 per license), thereby making the "scale" of available information to harvest

minimal;  (2)  most AntiVirus software applications are constantly being updated to prevent

the successful deployment of the Target Product; (3)  the Target Product maintains its own

event log which records the usage of its registered users and identity thieves would not want

such an evidentiary record of their activities available for law enforcement; and (4) the

Target Product is antithetical to the perpetrators of identity theft's desire to achieve an "economy of scale" when designing an attack on a system since the vast majority of stolen information is typically unusable.  Laykin ¶ 20.  As the only expert to provide evidence about the manner in which identity theft is carried out, Mr. Laykin's opinions are undisputed and directly contradict the FTC unsupported speculation that the Target Product is being used to commit identity theft to the detriment of the public at large.  As such, the FTC cannot make the required showing of substantial harm.

> **2.    The FTC Has Not and Cannot Show that the Injury Alleged is Not Outweighed by Any Countervailing Benefits**

In its briefing in this matter, the FTC focuses an overly bright spotlight on *alleged*, but unsubstantiated, nefarious and illegal uses of the Target Product product, while self-servingly ignoring the numerous legitimate and legal, and in fact intended, uses of the product.  To begin with, CyberSpy's license agreement makes clear that the purchaser of its products "may only install this software on a computer that [the purchaser] own[s], or on a computer from which [the purchaser] ha[s] consent of the owner to install this software." Schools, attachment 5.  Spence ¶ 10.  The content of the License Agreement is reinforced by the Defendants website that contains numerous warnings about the unauthorized installation of the Target Product.  Spence ¶ 12.  Furthermore, the FTC makes no mention whatsoever of the fact, perhaps because it never bothered to inform itself, that Defendants can and do take measures, as necessary, to prevent abuse of its products.  Spence ¶ 13.  Finally, in the two instances where Defendants have been informed that an abuse of the Target Product might have occurred, they have assisted law enforcement.  Spence ¶ 14-16.

To its knowledge, CyberSpy's customers adhere to this License Agreement.  Spence ¶ 10.  As made clear by its satisfied customers, the Target Product has numerous legitimate and

valuable uses and permits users to protect their family and businesses. *See* Section II(B)(1), *infra*. This evidence is supported by the fact that remote keylogger products are the recipients of numerous industry and consumer awards. Johnson ¶ 16, Exhibit 17. For example, iSpyNOW is freely being advertised for sale on the Internet as "the critically acclaimed, award winning remotely deployable computer monitoring application … offering users the ability to remotely monitor a machine via a web interface without ever having physical access to that PC." Johnson Exhibit 22. This undisputed evidence, when counterbalanced by the speculative nature of the harm alleged, makes clear that the purported injury alleged by the FTC is outweighed by countervailing benefits.

### B. The FTC Has Not Demonstrated and Cannot Demonstrate that the Balance of Equities Tips in Its Favor

The FTC claims that the balance of equities tips in its favor because "the public has a strong interest in immediately halting an unfair and deceptive practice affecting thousands of consumers." FTC Memo, pp. 22-23. The FTC further claims that Defendants "lack any legitimate interest that would be infringed…." FTC Memo, p. 23.

Putting aside the inflammatory rhetoric, the fact is that the FTC has provided no evidence that a single customer, much less "thousands of consumers" have been affected by CyberSpy's advertising and selling of the Target Product. CyberSpy is a small company, with a very small market share, which has many competitors. It is truly the "little fish in a big pond." Targeting this one small company will not "halt" any alleged "unfair and deceptive practice" but rather will simply benefit its competitors by allowing them to gain CyberSpy's market share. Interestingly, these competitors sell products with the same functionality as the Target Product and employ the same promotional techniques as the Target Product, yet are not being singled out by the FTC. *See* Section II(C), *infra*.

Enjoining CyberSpy will, however, greatly infringe upon Defendants interests.  The entirety of CyberSpy's business is at a complete standstill based on the TRO.  Spence ¶ 22. It is wholly unable to service its existing customers and unable to sell its products.  If CyberSpy is enjoined by the issuance of a preliminary injunction, the company will no doubt be permanently shut-down and potentially bankrupted since the revenues from the Target Product account for more than 99% of CyberSpy's income and is Mr. Spence's livelihood. Spence ¶ 21.  Accordingly, there is little doubt that the balance of equities here tips not in favor of the FTC but rather in favor of Defendants.

**C.      The FTC Has Not Demonstrated and Cannot Demonstrate that the Alleged Violations are Continuing or Likely to Continue and that a Preliminary Injunction is in the Public Interest**

**1.      The FTC Has Not and Cannot Show that the Alleged Violations are Continuing or Likely to Continue**

As set forth in the Defendants incorporated Motion for Summary Judgment, there is no evidence that the Defendants committed any violation of the FTC Act, much less a continuing violation.  Indeed, as acknowledged by Dr. Good, the Defendants accurately described the functionality of the Target Product to the consuming public.  Good, p. 35. Although the FTC began its "investigation" of the Target Product as early as August 20, 2008, Good ¶15, it never approached Defendants and requested that CyberSpy alter its business practices or change its website.  Had Defendants been approached, CyberSpy would have been happy to make reasonable changes to accommodate any concerns on the part of the FTC and remain willing to do so.[12]  Spence ¶ 23.  In fact, at time of the issuance of the TRO, CyberSpy was already in the process of updating the website for the Target Product,

---

[12] Indeed, if any injunction is issued, it should be modified to only require that Defendants remove content from its website, such as the reference to LoverSpy, that is not found on its competitors' websites.

since it was created at the direction of Mr. Spence's former business partner[13], who is no

longer affiliated with the Target Product.  Spence ¶ 23.

> **2.     The FTC Has Not and Cannot Show that a Preliminary Injunction
> is in the Public Interest**

In seeking to enjoin CyberSpy from advertising and selling the Target Product, the

FTC ignores two critical factors in what appears to be its "war" of "spyware."  First, the

Target Product is intended to be used and is in fact used for legitimate and legal purposes, as

detailed *infra*.  In addition, the Target Product is most certainly not the only product of its

kind being advertised and sold on the Internet at the time of this filing.  Accordingly,

whatever "risk" to the public the FTC perceives with regard to the Target Product will in no

way be alleviated must less eliminated by forcing CyberSpy out of business.  Indeed, it will

only deprive CyberSpy's customers of the services they have paid for and should be

enjoying, just as customers of CyberSpy's competitors are enjoying the services they have

paid for.  Indeed, if the FTC truly wanted to serve and protect the public interest then it

would have simply created rules to regulate the industry as a whole, rather than singling out

one very small slice of the market share to target.  As such, the FTC's requested injunction

will do nothing to protect the public from the harm which the FTC seeks to prevent.

WHEREFORE, Defendants respectfully request that the Court enter an order vacating

or modifying the TRO and denying Plaintiff a preliminary injunction.

Respectfully submitted,

s/Dawn Giebler Millner
Dawn I. Giebler-Millner, Esq.
Florida Bar No. 856576

---

[13] Remarkably, Mr. Spence's former business partner, Douglas Tubbs, who designed the Target Product's website (Spence ¶ 4),sells and promotes a Competitive Remote Keylogger Software Product (InvisibleKeylogger) using a website that is substantially *identical* to the website associated with the Target Product.  However, the InvisibleKeylogger product apparently has not been targeted by the FTC as it remains available for sale.  Johnson, Exhibit 47.

Michele L. Johnson, Esq.
Florida Bar No. 13570
Mary Ellen Pullum, Esq.
Florida Bar No. 24673
GREENBERG TRAURIG, P.A.
450 S. Orange Avenue, Suite 650
Orlando, FL 32801
Telephone No. (407) 420-1000
Facsimile No. (407) 841-1295
gieblerd@gtlaw.com

*Attorneys for Defendants CyberSpy*
*Software, LLC and Tracer R. Spence*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the **November 19, 2008** I electronically filed the foregoing with the Clerk of the Court for filing and uploading to the CM/ECF system, which will send a notice of electronic filing to the following:  **David K. Koehler, Esq.**, dkoehler@ftc.gov, and **Tracy R. Shapiro, Esq.**, tshapiro@ftc.gov.

s/Dawn Giebler Millner
Dawn I. Giebler-Millner, Esq.
Florida Bar No. 856576