UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

CYBERSPY SOFTWARE, LLC, and
TRACER R. SPENCE,

    Defendants.

Case No. 6:08-cv-1872-ORL-31GJK

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY TEMPORARY RESTRAINING ORDER AND REPLY TO ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AGAINST DEFENDANTS**

**I.    INTRODUCTION**

In opposing the entry of a preliminary injunction, Defendants argue that their conduct of selling a remotely deployed, surreptitious keylogger, complete with instructions on disguising it as an innocuous email attachment and advertised as a means to spy on friends, lovers, or anyone else, and then disclosing the intercepted information to persons who follow those instructions is somehow the equivalent of selling a pair of binoculars.  It isn't.  They also argue that government action to stop their misconduct is precluded because others may be acting similarly.  They're wrong.  Defendants' conduct is likely to cause substantial consumer injury and is likely to mislead consumers.  In such circumstances, the FTC has the authority to seek, and the Court has the authority to grant, the Commission's requested preliminary injunction.

## II.     THE FTC HAS STANDING TO ENFORCE THE FTC ACT

Section 13(b) of the FTC Act authorizes the Commission, through its own attorneys, to initiate federal district court proceedings to enjoin violations of the FTC Act and to secure such other equitable relief, including restitution and disgorgement of ill-gotten gains, as may be appropriate in each case.  15 U.S.C. § 53(b); *see also FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984).  Thus, Congress has conferred standing on the Commission to bring enforcement actions under the FTC Act.  *See SEC v. Rogers*, No. 07-10885, 2008 U.S. App. LEXIS 13259 at *3 (5th Cir. 2008) ("Congress may confer standing on federal agencies to bring enforcement actions under its statutes.").  To have standing to state a claim, a government agency must show that it has an interest in the relief sought sufficient to entitle it to move in the matter.  *United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979).  Express statutory authority establishes such an interest. *In re South Park Land & Livestock Co., Inc.*, 6 B.R. 479, 481 (Bankr. C.D. Cal. 1980).

The cases to which Defendants cite in support of their standing argument all involve *private citizens* as the plaintiffs.[1]  The Constitutional standing analysis articulated in *Lujon* and other Supreme Court cases is addressed to separation of powers issues implicated when private citizens attempt to hold the government accountable, require that the laws be observed, or to otherwise vindicate the public interest.  *See generally*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-78 (1992); *Warth v. Seldin*, 422 U.S. 490,

---

[1] Tellingly, Defendants cite no cases in which a federal agency was held not to have standing to enforce a statute that Congress authorized it to enforce.

508 (1975) (plaintiff who seeks to challenge exclusionary zoning practices "must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention"). "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Lujan* at 576. The FTC has been empowered by those branches to vindicate the public interest in halting deceptive and unfair acts or practices.

The remainder of the Defendants' standing argument regarding injury and causation is largely a defense to the underlying elements of unfairness: that an act or practice cause or be likely to cause substantial injury and will be addressed below.

**III.   THE COMMISSION IS REQUIRED ONLY TO SHOW THAT THE UNFAIR PRACTICES ARE LIKELY TO CAUSE INJURY, AND THAT THE DECEPTIVE PRACTICES ARE LIKELY TO MISLEAD**

Turning to the merits of the case, the Defendants argue that because the FTC has not yet submitted evidence regarding the actual consumers who were injured by RemoteSpy, the preliminary injunction should be denied. In fact, neither proof of consumer injury nor consumer reliance is necessary to establish a Section 5 violation. The Commission is required only to show that the unfair practice is *likely to cause* injury to consumers, and that the deceptive practice is *likely to mislead* consumers. *See* 15 U.S.C. § 45(n);[2] *FTC v. Tashman,* 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. Atlantex*

---

[2] *See also* Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Committee on Commerce, Science, and Transportation, United States Senate, Commission Statement of Policy on the Scope of Consumer Unfairness Jurisdiction, appended to *International Harvester Co.*, 104 F.T.C. 949, 1064 (1984) ("Unfairness Statement").

*Assocs.,* 872 F.2d 966 (11th Cir. 1989)*; FTC v. Neovi, Inc.*, No. 06-CV-1952-JLS (JMA), slip op. at 10 (S.D. Cal. Sept. 16, 2008) (attached as **Exhibit D** in "Plaintiff's Exhibits"); *FTC v. Accusearch, Inc.,* No. 06-CV105, 2007 U.S. Dist. LEXIS 74905, *16-17 (D. Wyo. Sept. 28, 2007). Were this not the case, the law would preclude the FTC from taking preemptive action against those responsible for Section 5 violations, contrary to the FTC Act's prophylactic purpose. *FTC v. Freecom Commc'n, Inc.,* 401 F.3d 1192, 1203-1206 (10th Cir. 2005) (holding that the district court was erroneous in believing that the FTC had to present a "parade" of consumer witnesses to establish its case).[3]

In addition to the self-evident financial injury that can flow from the unauthorized disclosure of a consumer's confidential personal information, such as credit card numbers, bank account numbers, and password, the FTC submitted the declaration of Cindy Southworth, an internationally recognized expert on the intersection of technology and domestic violence, who provides credible and probative evidence that keylogger spyware can and has been used by stalkers and abusers to harm consumers, including significant physical, financial, and emotional injury.

Defendants' attempts to disparage the evidence Ms. Southworth relies on fails entirely to dispute that RemoteSpy can be used by stalkers and abusers to harm their

---

[3] Moreover, the Commission is not required to prove up its case at the preliminary injunction stage; rather the Commission must only establish that the FTC will likely ultimately succeed on the merits and the balance of the equities tips in the Commission's favor. *See FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991); *FTC v. Para-Link Int'l*, No. 8:00-CV-2114-T-17TBM, 2001 U.S. Dist. LEXIS 17372 (M.D. Fla. Feb. 28, 2001). Indeed, much of the additional proof supporting Plaintiffs claims is either likely in the possession or largely within the control of Defendants or their agents and, therefore, would be unavailable at this stage of litigation.

victims.[4] Instead, to rebut the fact that RemoteSpy will likely cause substantial injury to consumers, the Defendants assert, through the declaration of Eric Laykin, that RemoteSpy is ill-suited for gangs of organized criminals seeking to commit identity theft.[5] Even if such is the case, this flawed logic overlooks that organized crime gang members are not the only individuals who commit identity theft.[6] In fact, the FTC's 2006 Identity Theft Survery observed that 16% of identity theft victims surveyed personally knew their identity thief. In addition, recent prosecutions where keyloggers have been used for identity theft have not been limited to organized criminal gangs.

Defendants advertise that RemoteSpy can be used "secretly and covertly" to "spy on anyone," and offer the stealth email account service which purports to allow RemoteSpy customers to install the program "without being traced." Thus, even if

---

[4] Ms. Southworth provided similar testimony regarding the injurious use of personal telephone records in *FTC v. Accusearch*. *See* Plaintiff FTC's Opposition to Defendants' Motion to Strike the Declaration of Cindy Southworth, MSW (Docket No. 32).

[5] Laykin draws such conclusions despite his own admission that he has not observed or tested RemoteSpy. *See* Laykin Decl. ¶ 15.

[6] *See News Release, Oregon Man Sentenced to Four Years in Prison for Selling Counterfeit Software Worth $1 Million* (Jul. 23, 2008), *available at* http://www.usdoj.gov/criminal/cybercrime/mondelloSent.pdf. (describing how defendant stole individuals' personal information, such as victims' names, bank account numbers and passwords, by using a keystroke logger program, and used the stolen identities to establish online payment account); *News Release, Three Indicted for Fraud and Unauthorized Access of FAMU Computer System* (Oct. 21, 2008), *available at* http://www.usdoj.gov/usao/fln/press%20releases/2008/oct/famu.html (describing the indictment for aggravated identity theft, *inter alia*, which alleged that three Florida Agricultural and Mechanical University students accessed the FAMU computer system by surreptitiously installing keystroke loggers on computers used by the employees of the registrar's office and stole user names and passwords to commit identity theft).

RemoteSpy is "far from the ideal tool for individuals wishing to engage in identity theft" without being caught, Defendants don't give their customers that impression.

## IV. THE DEFENDANTS' OWN CONDUCT CAUSES CONSUMER INJURY

Defendants appear to argue that if there is any consumer injury, it is caused by the RemoteSpy customers rather than Defendants, and that Defendants cannot be held liable under an unfairness theory for the acts of third parties that they do not control. On the contrary, the Commission "seeks to hold Defendants liable solely for their own conduct, not anyone else's." *Accusearch*, 2007 U.S. Dist. LEXIS 74905 at *20 (rejecting defendants' argument that third party vendors, rather than the defendants, engaged in deception to obtain phone records that defendants sold). In unfairness cases, a defendant can cause consumer injury "even where there is no contact between the [defendant] and the ultimate consumer." *See In re C&D Elecs., Inc.*, 109 F.T.C. 72, 79 (1987) (explaining that the sale of cable television decoders, which allowed purchasers to steal cable television signals, fits the analytical framework for unfairness because the FTC's concerns in halting conduct that harms the public is not limited to injury incurred by the direct purchasers of products).

The evidence shows that Defendants's own conduct causes consumers injury. The Defendants design and sell keylogger spyware that contains features uniquely needed by someone who is not the owner or authorized user of a computer. Spence admits that in designing the spyware, he purposefully added the features that would enable it to be remotely installed. *See* Spence Aff. ¶ 4. Defendants also provide step-by-step instructions to the RemoteSpy customers detailing how to mask the RemoteSpy

executable in an email or Microsoft Word document, and encourages the customers to "be creative" in choosing the disguise. *See* Good Decl. ¶ 17; Schools Decl. Att. 11. Spence also admits that when some anti-virus security programs have identified RemoteSpy as spyware, he has intentionally modified the RemoteSpy program so that it is once again able to slip by these programs undetected. Spence Aff. ¶ 4; *see also* Good Decl. ¶¶ 55-56. Further, Defendants themselves extract the consumer victims' personal information from their computers, host the intercepted information, and organize it for their customers. *See, e.g.,* Good Decl. ¶¶ 10-13. Even if an owner or authorized user of a computer were to find the spyware, Defendants designed it in such a manner that he or she would be unable to remove it. *See id.*

A similarly misguided causation argument was rejected in *FTC v. Neovi Inc.*, No. 06CV1952 (S.D. Cal. 2008). In that case, the defendants operated Qchex.com, a website that allowed users to enter check and bank account information, and thereby create checks that could be sent to third parties. The FTC alleged that the defendants unfairly created and delivered checks without first verifying that the person making the request had the authority to draw checks on the account, which caused injury to consumers who either received fraudulent checks or had their accounts fraudulently drawn on. Defendants argued that the Qchex customers who misused the Qchex program by creating and delivering fraudulent checks caused the injury sustained. Noting that "the launch of Qchex was a dinner bell for fraudsters," the court concluded that both the Qchex customers and the defendants' business practice, which "significantly facilitated fraudulent activity," caused consumers substantial harm.

A causation defense was also rejected in *FTC v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 U.S. Dist. LEXIS 74905 (D. Wyo. Sept. 28, 2007). In that case, a court found that it was an unfair practice for the operators of a retail website liable to obtain and sell confidential consumer phone records without the consumers' knowledge or consent. The court held that it was no defense that third party vendors, rather than the defendants, engaged in the deception to obtain the phone records. The court explained that defendants caused consumers substantial harm because each time they placed an order for phone records, they caused others to use false pretenses and other fraudulent means to obtain confidential consumer phone records.

Likewise, the Defendants' own practices in this case significantly facilitate unfair and deceptive acts by including in RemoteSpy deployment features that are uniquely needed by someone who is not the owner or authorized user of the computer, and by providing step-by-step instructions on how to disguise the keylogger in order to trick unsuspecting consumer victims into installing it. In this way, RemoteSpy "acts as a dinner bell" for those looking to secretly install spyware and surreptitiously access personal information from computers over which they lack physical and legal access.

Defendants claim that they intend for RemoteSpy to be used only for legitimate and legal purposes. Opp. at 20.[7] However, knowledge or intent is not an element of an

---

[7] Defendant Spence asserts that it is his understanding that the "overwhelming majority" of his customers install the spyware on computers that they own or on which they have the consent of the owner to install the spyware. Spence Aff. ¶ 10. Spence offers no basis for this assertion, and does not explain how he has personal knowledge regarding the manner in which the "overwhelming majority" of the 11,138 RemoteSpy customers are using the product. *See id.* at ¶¶ 10, 20.

FTC Act violation. *FTC v. Accusearch*, 2007 U.S. Dist. LEXIS 74905 at p. 6.  Moreover, Defendants' advertising claims, secret install instructions, and "UnderCover Email Account Service" belie this defense.  For example, Defendants' statements that RemoteSpy can be used to "SPY ON ANYONE.  FROM ANYWHERE." including "Your Friends . . . Your Lover . . . Or Anyone Else!" contradict Defendants' purported belief that the program is installed only on RemoteSpy customers' own computers.  Notably, nowhere in Defendants' Response, Motion for Summary Judgment or Affidavits do Defendants offer an explanation as to why a computer owner wishing to install RemoteSpy on his own computer would need step-by-step instructions detailing how to trick consumers into installing it, or why a computer owner would need to purchase Defendants' "UnderCover Email Account Service," which Defendants advertise as providing "[s]tealth email for anonymously sending your RemoteSpy install file without being traced."  *See id*.  Defendants have sold over one thousand "stealth" email licenses.  *See* Schools Decl. at ¶ 29.  Defendants simply cannot design a program to install remotely, assure their customers that there is manner to deploy the spyware without it being traced back to them, promote the program's surreptitious installation and use, and then claim blissful ignorance that the program might be used in such a manner.

Defendants argue that RemoteSpy customers who misuse the product do so in violation of the License Agreement.  Defendants' specious argument, however, belies that fact that RemoteSpy customers were *never* clearly and prominently presented with the license's requirements or limitations.  Thus, this is not a question of RemoteSpy being "abused" by "people who ignore the terms of the License Agreement" as

Defendants protest (Defendants' Memo at 9), but rather an example of customers who were never unavoidably presented with Defendants' off-site license terms or buried legal disclaimers. Moreover, although Spence defends that his e-commerce platform provides "fraud detection and prevention mechanisms," all of these purported "efforts to prevent abuse" appear to be directed at protecting Defendants' financial bottom line from fraud and have nothing to do with protecting consumers from improper uses of RemoteSpy. *See* Spence Aff. at ¶ 13.

After attempting to deflect blame to its customers, Defendants then point the finger at other technologies. Defendants and their expert argue that Remotespy is like "any seemingly innocuous product" on the market that could be used to harm the public, *e.g.*, cameras, binoculars and telescopic lenses can be used to monitor people in public places. However, a keylogger by its very nature is meant to secretly captures one's most personal information. Rather than build in safeguards details and transmits that information to unknown and unauthorized third parties can hardly be characterized as a "seemingly innocuous product." Moreover, that a product may have some conceivable legitimate uses does not automatically render the product "legal" as Defendants assert. *See, e.g., United States v. Herring*, 993 F.2d 784 (11th Cir.) (en banc), *cert. denied*, 510 U.S. 933 (1993); *FTC v. Neovi Inc.*, No. 06CV1952 (S.D. Cal. 2008) (holding operators of check creation technology liable for consumers' injury despite fact that the product was extensively used for legitimate purposes). In *United States v. Herring*, the Eleventh Circuit upheld the defendant's convictions for violating 18 U.S.C. § 25112(1)(b)'s prohibition against manufacturing and selling electronic devices, the design of which

renders them primarily useful for the purpose of surreptitious interception of electronic communications, by modifying a device typically used to descramble cable signals. The court concluded:

> Although the modified device retained many of the legitimate uses of the legitimate VC II [footnote omitted], the distinctive feature of the modified design involved the surreptitious interception of electronic communications. Because of this distinctive feature, consumers were apparently willing to pay a significantly higher price for the modified device as compared to a legitimate VC II.

993 F.2d at 789. Likewise, although RemoteSpy can theoretically be used to monitor a consumer's own computer, its distinctive feature is its ability to be disguised as an email attachment and remotely installed. It is for this feature that Defendants charge a significantly higher price than they do for their locally-installed keylogger program, and it is this feature that renders RemoteSpy primarily useful for someone other that the owner of the target computer. Moreover, this is the feature that the Defendants primarily advertise: the ability to "SPY ON ANYONE," and to secretly record information from people including such people as "Your Girlfriend/Boyfriend," "Your Friends," "Your Lover," "Or Anyone Else."

## V. DEFENDANTS FAIL TO ASSERT ANY COUNTERVAILING BENEFITS FOR THE MOST OFFENSIVE FEATURES OF REMOTESPY

Defendants fail to make a credible case that RemoteSpy provides sufficient countervailing benefits to outweigh the dangers posed by the spyware. Contrary to the "SPY ON ANYONE" advertising claims, Defendants desperately want the Court the accept Defendant Spence's conclusory assertions that RemoteSpy is merely innocuous software that is: (a) "most frequently used by parents"; (b) "popular" with employers;

and (c) "extremely useful" to physicians. *See* Spence Aff. ¶¶ 7-9.

Notably, neither Spence, Defendants' expert,[8] nor any of the customer declarants address or explain why a parent, employer,[9] or physician[10] who is the legitimate *owner or authorized user* of a computer would need to deceptively deploy the RemoteSpy remotely, let alone disguise the spyware module, use social engineering to trick the target, or use the "untraceable" stealth email promoted by Defendants. Indeed, not one of the customer declarants produced by Defendants evidenced a situation that required the

---

[8] Although Laykin offers the conclusory assertion that "the option to remotely install the product . . . would be a critical component for any investigative need or requirement to install the product on machines which are used by dependent minors or employees," he: (a) fails to explain why the remote functionality would be critical or the basis for his opinion; and (b) completely ignores the other unfair and deceptive tactics promoted by Defendants.

[9] Given the patchwork of state and federal laws and regulations regarding privacy and the interception of communication, best practices presumably dictate that legitimate employers would routinely provide notice to employees or require that employees consent to be monitored incident to their employment. In fact, Defendants' own expert, Erik Laykin, has previously opined: "Generally speaking, employers have an obligation to tell employees there's a surveillance program." Stephen Lawson, *Yes, You Are Being Watched*, PC World (Dec. 27, 2002) (Laykin concluding that "Silent Runner" surveillance software "is tightly controlled" because "it could be dangerous in the wrong hands"), *available at* http://www.pcworld.com/article/108121-3/yes_you_are_being _watched.html.

[10] Defendants' cavalier promotion of RemoteSpy as "extremely useful, especially in light of the privacy and information control requirements of government regulations like the Health Insurance Portability and Accountability Act ('HIPAA')" is quite remarkable. *See* Spence Aff. ¶ 9; Brannon Decl. ¶ 3. Given that use of RemoteSpy in a physician's office would send patients' sensitive health information in the clear over unencrypted Internet channels and then be stored by Defendants on unencrypted servers (*see* Good Decl. ¶ 76), Defendants' claim is astounding given the numerous access, storage, and transmission requirements that HIPAA mandates. *See, e.g.*, Department of Health and Human Services, *HIPPA Security Guidance* (Dec. 28, 2006), *available at* http://www.cms.hhs.gov/SecurityStandard/Downloads/SecurityGuidanceforRemote UseFinal122806.pdf.

remote installation of RemoteSpy through deceptive means.  Not surprisingly, Defendants' opposition papers are devoid of any reference to – let alone an explanation for the legitimate use of – the "UnderCover Stealth Email" option ("Stealth email for anonymously sending your RemoteSpy install file without being traced") that Defendants promote and "recommend" as a "complement" to RemoteSpy.  Schools Decl. Att. 14.

While Defendants endeavor to paint RemoteSpy as nothing more than a useful tool for parents and employers, they fail to explain the countervailing benefits provided by the most offensive aspects of the spyware's functionality and Defendants' promotion and participation in unfair and deceptive acts and practices.  In fact, Defendants practically ignore the deceptive aspects of the software.

## VI.   THE INJURY THAT DEFENDANTS CAUSE IS NOT REASONABLY AVOIDABLE

The Defendants do not seriously contest that consumers cannot avoid the injury they sustain.  While Spence asserts that "many forms of anti-virus software are capable of blocking the installation of [RemoteSpy]" (Spence Aff. ¶ 6), and Laykin concludes, without actually having tested the program, that the vast majority of anti-virus programs identify RemoteSpy (Laykin Decl. ¶ 22), Spence admits that when anti-virus programs identify RemoteSpy as spyware, he intentionally modifies the program so that it is once again able to slip by these anti-virus programs undetected.  Spence Aff. ¶ 5.  Moreover, the FTC's technical expert concluded, based on actual, hands-on testing, that:  (a) prior to September 2008, Symantec – the leading consumer anti-virus program – failed to detect RemoteSpy; and (b) RemoteSpy had been updated as recently as October 2008 such that

it successfully avoided detection by McAfee – another leading anti-virus program – that had previously detected the spyware.  *See* Good Decl. ¶¶ 55-56, 67-71.

## VII. DEFENDANTS MISSTATE FTC LAW ON MEANS AND INSTRUMENTALITIES

The Defendants erroneously conclude that, because the RemoteSpy customers received a product that performs as advertised, the Defendants did not commit any deceptive acts.  The FTC's deception count alleges that by providing the RemoteSpy customers with step-by-step instructions, including screenshots and examples, demonstrating how to falsely represent the nature of the RemoteSpy executable to the consumer victims, and by teaching the RemoteSpy customers techniques for delivering the RemoteSpy executable to consumer victims' remote computers via email, including how to falsely represent that the disguised executable is part of a Microsoft Word document, Defendants have provided others with the means and instrumentalities to deceive the consumer victims into installing RemoteSpy on their computers.  Providing others with the means and instrumentalities to engage in unfair and deceptive practices is itself a violation of Section 5.  *See Gellman v. FTC*, 290 F.2d 666 (8th Cir. 1961) (citing *Peerless Prods., Inc. v. FTC*, 284 F.2d 825, 826-27 (7th Cir. 1960), *cert. denied*, 365 U.S. 844 (1961)); *Globe Cardboard Novelty Co. v. FTC*, 192 F.2d 444 (3d Cir. 1951).[11]

Defendants do not dispute that representing a keylogger program as an innocuous

---

[11]  Defendants inexplicably state that the means and instrumentalities theory is "newly created," while simultaneously citing FTC means and instrumentalities cases from 1951, 1952, 1961 and 1963.  The FTC means and instrumentalities doctrine is well established in FTC jurisprudence, as demonstrated by both the FTC's and Defendants' citations.

file such as pictures would be deceptive. They claim only that they are not responsible for the deception because, despite providing their customers with the materials to consummate that deception, Remotespy customers are not the Defendants' agents. However, seminal means and instrumentalities cases in fact establish it is no defense that third parties over which defendants had no control engaged in the unfair or deceptive acts or that defendants lacked knowledge of the third parties' acts. *See Gellman v. FTC*, 290 F.2d 666 (8th Cir. 1961); *Peerless Prods., Inc. v. FTC*, 284 F.2d 825, 826-27 (7th Cir. 1960), *cert. denied*, 365 U.S. 844 (1961); *Globe Cardboard Novelty Co. v. FTC*, 192 F.2d 444 (3d Cir. 1951). In *Gellman*, *Globe Cardboard*, and *Peerless Products*, the petitioners all sold devices known as "punchboards," which petitioners' customers adapted to be used for the distribution of merchandise by lottery in violation of the FTC Act. The courts uniformly held that it was no defense that petitioners sold "plain boards," which had no legend printed upon them, and that third parties – the vendees (who were not agents) – attached to the boards the legends of winning numbers and merchandise prizes. In *Gellman*, the court rejected the defense that the petitioners lacked knowledge of the third parties' acts, explaining:

> Petitioners also profess lack of knowledge that the punchboards would be used for selling merchandise. What else could they have meant or intended when they advertised and sold punchboards as 'merchandise boards'[?] . . . To accept petitioners' profession of innocence would require more naivete than this court is willing to admit. Be that as it may, however, whether petitioners knew or did not know of the intended use to which the boards were to be put is without significance.

290 F.2d at 670.

Similarly, the Defendants ask this Court to accept that while they specifically

designed the product to include the features that render it unfair (remote install), promoted and encouraged the unfair uses (spy on friends or lovers), and instructed their customers on how to trick people into installing their product, they were unaware that their customers would engage in these unfair and deceptive acts.  In any event, as the Court in Gellman noted, whether they knew of the intended use is without significance.

>  Defendants' further distort means and instrumentalities law when they state that:
> 
> [C]ase law is clear that where the FTC is unable to demonstrate that a particular defendant participated directly in the wrongful practices or acts, then it must prove that the non-actor defendant had the authority to control the actions of the individuals committing the deception **and** knowledge of the wrongful acts or practices.

Defendants' MSJ at 12 (citing *FTC v. Jordan Ashley, Inc.*, No. 93-2257-CIV, 1994 WL 200775, at *3 (S.D. Fla. Apr. 5, 1994)).  It is puzzling that, to defend themselves against means and instrumentalities claims, Defendants cite a case that did not involve means and instrumentalities.  In *Jordan Ashley*, the court concluded that the corporate defendants had violated Section 5 of the FTC Act by engaging in deceptive business opportunity scams.  *See* 1994 WL 200775, at *2-3.  Turning to the question of the individual defendants' liability, the court set forth the accepted standard for when an individual will be held liable for the Section 5 violations of a corporate defendant.  *See id.* at *3.  The Defendants' citation above references the court's discussion on individual liability.  Accordingly, *Jordan Ashley*'s only relevance to this proceeding is to confirm Tracer Spence's liability for the alleged law violations.[12]

---

[12] Spence's admission that he is the founder, CEO, and only officer, director, shareholder or employee of CyberSpy, and that he designed and frequently updates

## VIII. THE COMMISSION HAS THE DISCRETION TO SELECT ITS ENFORCEMENT POLICIES AND PRIORITIES

Without the benefit of supporting caselaw, Defendants also raise what can best be described as the "but everyone else is doing it" defense. Just as that was an insufficient excuse in grammar school, it equally fails as a defense to a violation of the FTC Act. Defendants' argument that the instant action somehow lacks merit because there are other similar "Competitive Remote Keylogger Products" available is simply without moment.[13]

"The Commission has wide discretion in selecting its methods of remedying deceptive and unfair practices. . . . This discretion extends to the decision whether to proceed by rulemaking or adjudication." *Encyclopaedia Britannica, Inc. v. FTC*, 605 F.2d 964, 974 (7th Cir. 1979), *cert. denied*, 445 U.S. 934 (1980) (citations omitted). Moreover, it is well settled that when the Commission proceeds by litigation, the choice of defendants – including the decision to proceed against one entity to the exclusion of its competitors – lies solely within the discretion of the Commission. *See FTC v. Virginia Homes Mfg. Corp.*, 509 F. Supp. 51, 53 n.1 (D. Md. 1981) (summarily dismissing defendants' "obfuscatory arguments" that "the FTC cannot unilaterally move against it

---

RemoteSpy's functionality, puts to rest any dispute regarding whether he participated directly in or had some measure of control over the challenged practices; and had or should have had some knowledge or awareness of those practices. *See* Spence Decl. ¶¶ 2, 4.

[13] Ironically, Defendants' new-found "little fish in a big pond" modesty before the Court is flatly contradicted by their homepage representations that RemoteSpy is the "most powerful software of its kind," "the most intelligent spy software available," and "RATED #1 SPY SOFTWARE." Complaint Ex. A; Schools Decl. Att. 12.

without also moving against other similarly situated . . . manufacturers")*; see also FTC v. Universal-Rundle*, 387 U.S. 244, 246, 251 (1967); *Moog Industries v. FTC*, 355 U.S. 411, 413 (1958) ("[T]he decision as to whether or not an order against one firm to cease and desist from engaging in illegal price discrimination should go into effect before others are similarly prohibited depends on a variety of factors particularly within the expert understanding of the Commission."); *Ger-Ro-Mar, Inc. v. FTC*, 518 F.2d 33, 35 (2d Cir. 1975) (holding "that while petitioners may be unfortunate in being the first target . . . the Commission is under no obligation to start simultaneous suits against all alleged offenders").[14]

---

[14]The Eleventh Circuit has rejected a similar discriminatory law enforcement argument in *United States v. Biro*, 143 F.3d 1421 (11th Cir. 1998). In that case, the defendants argued that the Wiretap Act's requirement that a person "having reason to know" that the design of a device renders it "primarily useful" for the purpose of the surreptitious interception of communications was so that it would result in discriminatory law enforcement. The Court of Appeals, although distinguishing the various devices, noted that it did not need to decide whether the Radio Shack device was an illegal ESID (electronic surveillance interception device). "There are legitimate reasons why law enforcement might target certain vendors of ESIDs over others." *Id.* at 1431. The district court in *United States v. Spy Factory, Inc.*, an analogous case in which § 2512 was challenged as unconstitutionally vague, state as follows:

> There is a perfectly understandable reason why officers and prosecutors seek convictions of defendants like the Spy Factory and not institutions like Radio Shack and Hammacher Schlemmer: because the Spy Factory, by its very name, and in countless other ways evidenced in the Government's papers, sets itself out as a place where one might be more likely to locate devices that can be used for illegal, rather than legal, purposes.

*United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 476-77 (S.D.N.Y. 1997) (footnote omitted).

**IX.    CONCLUSION**

For all the foregoing reasons and those previously articulated, the Federal Trade Commission respectfully requests that this Court deny Defendants' motion to vacate or modify the temporary restraining order (Docket No. 23) and enter the preliminary injunction order proposed by the Commission (Docket No. 19), with such other and further relief as the Court deems appropriate.

Dated:  November 24, 2008

Respectfully submitted,
WILLIAM BLUMENTHAL
General Counsel

s/David K. Koehler
DAVID K. KOEHLER
NY Bar. No. 2651404
TRACY R. SHAPIRO
CA Bar No. 220811
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Mail Drop  NJ-3212
Washington, D.C.  20580
TEL.: (202) 326-3627 (Koehler)
         (202) 326-2343 (Shapiro)
FAX: (202) 326-3259
Email: dkoehler@ftc.gov
          tshapiro@ftc.gov
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

  I HEREBY CERTIFY that, on **November 24, 2008**, I electronically filed the foregoing **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY TEMPORARY RESTRAINING ORDER AND REPLY TO ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AGAINST DEFENDANTS** with the Clerk of the Court by using the CM/ECF system, which would then send notice of the electronic filing to Dawn I. Giebler-Millner, Esq., gieblerd@gtlaw.com, Michele L. Johnson, Esq., johnsonm@gtlaw.com, and Mary Ellen Pullum, Esq., pullumm@gtlaw.com.

                 <u>s/David K. Koehler</u>
                 DAVID K. KOEHLER