```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE MIDDLE DISTRICT OF FLORIDA
 2                         ORLANDO DIVISION

 3                  Case no.:  6:08-cv-1872-Orl-31GJK

 4   FEDERAL TRADE COMMISSION,          )    Orlando, Florida
                                        )    November 24, 2008
 5                  Plaintiff,          )    2:00 p.m.
                                        )
 6                     v.               )
                                        )
 7   CYBERSPY SOFTWARE, LLC, and        )
     TRACER R. SPENCE,                  )
 8                                      )
                    Defendants.         )
 9   _____)

10

11

12               Transcript of preliminary injunction

13            before the Honorable Gregory A. Presnell

14                 United States District Judge

15

16

17   Appearances:

18   Counsel for Plaintiff:     Tracy Shapiro
                                David K. Koehler
19

20   Counsel for Defendant:     Dawn Giebler-Millner

21

22   Court Reporter:            Diane C. Peede, RMR, CRR
                                United States Courthouse
                                401 West Central Blvd., #4600
23                              Orlando, Florida  32801
                                (407) 615-0305
24

       Proceedings recorded by mechanical stenography, transcript
25     produced by computer.
```

```
 1                  P R O C E E D I N G S
 2           THE COURT:  Anita, call the case.
 3           THE COURTROOM DEPUTY:  This is in the matter of
 4    Federal Trade Commission versus Cyberspy Software, LLC, and
 5    Tracer R. Spence; case number 6:08-civil-1872-Orlando-31GJK.
 6           THE COURT:  All right.  And appearing for the
 7    Commission?
 8           MS. SHAPIRO:  Tracy Shapiro.
 9           MR. KOEHLER:  David Koehler.
10           MR. QUARESIMA:  Richard Quaresima.
11           THE COURT:  Thank you.
12           And for the defendant?
13           MS. GIEBLER-MILLNER:  Good afternoon, Your Honor.
14    I'm Dawn Millner from the law firm of Greenberg, Traurig
15    here in Orlando, Florida, with me at counsel table is my
16    client, Tracer Spence, as well as Mr. Clegg Ivy, who's an
17    attorney but not counsel of record, not a member of this Bar.
18           THE COURT:  All right.  Thank y'all.
19           MS. GIEBLER-MILLNER:  Thank you, Your Honor.
20           THE COURT:  All right.  We're here today on the
21    Commission's motion for a preliminary injunction or, in
22    essence, their application to convert the TRO to a
23    preliminary injunction.  I have the defendants' response to
24    that or, I could say, responses.  And I need to clarify at
25    the outset that the defendant, in addition to filing a
```

1  response, which was in the form of a motion to vacate or to

2  modify the temporary restraining order, at document number

3  23, also filed a motion for summary judgment.

4          Summary judgment is not ripe.  There's nothing in

5  this motion for summary judgment that I can legally consider

6  because it's not timely.  So to the extent you did that as a

7  way to try to find additional pages, I don't know why you did

8  it, but I can't consider it.  I'm not going to consider it,

9  but I do have your response.

10          I ruled this morning on the motion to strike the

11  declaration of Ms. Southworth, and I indicated I would

12  consider your arguments in the context of the weight to be

13  given that affidavit.

14          I also have the other affidavits filed in support

15  of the defendants' response, including that of the defendant,

16  and other declarations, all of which I have reviewed.

17          I forgot my mic.  Do you want to go get that for

18  me.  It's sitting right on my table.

19          I'm still learning how to deal with old age.  I've

20  got this chronic neck problem, so I've started standing,

21  which helps because I can't sit; and I'm supposed to have a

22  mic to make sure you can hear me, but I forgot to put it on.

23  So I will retrieve it.

24          Anyway, I moved this up to make sure we had

25  adequate time today for this hearing, although I don't

1  anticipate it should last more than an hour or two.

2            Thank you.

3            THE COURTROOM DEPUTY:  You're welcome.

4            THE COURT:  All right.  Now, do I have a microphone

5  now?

6            Okay.  So I'll be happy to hear from the Commission

7  first.  Please understand I've read all of the papers.  So,

8  you know, don't spend unnecessary time telling me the

9  obvious.

10           MS. SHAPIRO:  Good morning, Your Honor.

11           THE COURT:  It's afternoon, but good afternoon.

12           MS. SHAPIRO:  Good afternoon.  You're right.  Good

13  afternoon, Your Honor.

14           THE COURT:  Time flies when you're having fun.

15           MS. SHAPIRO:  It certainly does.  Well, as Your

16  Honor knows, having read the papers, the defendants market

17  and sell a program called RemoteSpy, which is a keylogger

18  spyware program that remote spyware customers can remotely

19  deploy and secretly install onto the computers of

20  unsuspecting victims.  Once installed, Remote Spy records

21  everything the victim does on the computer, every key stroke

22  they type, and sends that remotely to the defendants'

23  servers.  Once there, the defendants organize it and host it

24  and they provide their customers with user names and pass

25  words so they can log in from literally anywhere and check

1   and look at the information.

2           THE COURT:  Let me ask you this.  Is it the FTC's

3   position that every remote keylogger violates the act?

4           MS. SHAPIRO:  Yes, I think every remotely installed

5   keylogger would violate the act in that it's the

6   remote install that is the key feature that's uniquely needed

7   by people who lack authorized access or physical access to a

8   computer.

9           THE COURT:  What if I have a remote keylogger and I

10   send it to all my employees and I say, "Please download this

11   keylogger.  We're going to use this to monitor your e-mails."

12   That would be a violation of the act, even though it's

13   disclosed?

14           MS. SHAPIRO:  There's two issues in that question.

15   One is would your use be legal, and then the second issue is

16   would the sale of a keylogger that could be used that way.

17           THE COURT:  I'm talking about the sale of a

18   keylogger.

19           MS. SHAPIRO:  The sale of the keylogger would still

20   violate the act.

21           THE COURT:  Even if it's disclosed to the ultimate

22   consumer what it's being used for?

23           MS. SHAPIRO:  The product itself, because it

24   doesn't need to be disclosed, because it contains features

25   that uniquely enable it to be installed remotely and

1   secretly, that it doesn't have standard installation features

2   that would -- what would normally happen when you're

3   installing software, that would pop up and say, "Software is

4   about to install.  Do you want to install this?"  Because the

5   defendant, when he designed the software, purposefully left

6   those features out.

7           Don't get me wrong.  Employers, many employers,

8   monitor their employees and they do it with notice, but they

9   don't tend to use keyloggers like this and it tends to be

10  disclosed.  That's -- the best practices of employers is to

11  do that because it's possible that it's a wiretap violation,

12  if they don't.

13          THE COURT:  Yeah, but that doesn't answer my

14  question.  You changed the question.  I said, would it be the

15  position of the Commission that it would be unlawful if it

16  were disclosed?

17          MS. SHAPIRO:  If the program were to be redesigned

18  so that there would have to be a notification when it popped

19  up --

20          THE COURT:  Yes.

21          MS. SHAPIRO:  -- or if the employer just chose

22  to --

23          THE COURT:  I'm trying to, first of all, find out,

24  it's not the Commission's position that any remote keylogger

25  is necessarily an unfair trade practice?  It's merely a

1    matter of what it's used for and how it's sold and promoted?

2              MS. SHAPIRO:  Our position is actually that any --

3    not any keylogger.  So there are locally installed key

4    loggers --

5              THE COURT:  I said any remote keylogger.

6              MS. SHAPIRO:  Okay.  Yes, our position would be

7    that any remotely installed keylogger.

8              THE COURT:  Even if that program pops up and says,

9    "Warning:  When you open this file, it will subject your

10   computer to being tracked and traced," and whatever?  You're

11   saying that is a violation of the act?  That's absurd.

12             MS. SHAPIRO:  I'm sorry.  Just a moment, Your

13   Honor.

14             THE COURT:  Why don't you consult with your

15   co-counsel there a minute.

16             Let's try it again.

17             MS. SHAPIRO:  I'm going to revise my answer, Your

18   Honor.

19             THE COURT:  All right.

20             MS. SHAPIRO:  If -- this product, this keylogger

21   would always be unfair.  If there were another hypothetical

22   remotely installed keylogger that did have in the design that

23   it complied with the standard installation procedures, that a

24   pop-up did occur, that there were always notice to the

25   employee that this is running, that they are being monitored,

1  then that would not be a violation of the FTC Act.

2                    THE COURT:  So what I'm trying to do is narrow this

3  and focus this down to what the real problem is.

4                    MS. SHAPIRO:  Okay.

5                    THE COURT:  The problem is not just a remote

6  keylogger; it's that and something else.  It's the ability to

7  hide that application from the ultimate consumer or the

8  ultimate user, is the problem.

9                    MS. SHAPIRO:  Certainly.  It's, one, as I

10  mentioned, that it doesn't install -- that it doesn't comply

11  with the standard installation procedures, no pop-up, no

12  warning; that it isn't in the standard places where a user

13  would normally find software.  Normally you go to your add/

14  remove or you go to your task bar and that's where you find

15  software programs.  It doesn't do that.

16                    It gets around anti-virus and anti-spyware

17  programs.  As Tracer Spence admitted in his Declaration, on

18  the occasion in the past when somebody's anti-virus programs

19  have identified it as spyware, he intentionally redesigned

20  the program so that it could then slip by the antivirus

21  programs again.  And even if a computer owner is to finally

22  find the program, they are unable to uninstall it because of

23  the way that it's designed.  So it's those features, you're

24  correct.

25                    THE COURT:  And the inability to track where it

1    even came from?

2           MS. SHAPIRO:  The inability to track where it came

3    from and certainly also the instructions, the remote install

4    guides that Mr. Spence provides that say to the user, okay,

5    "If you want to get this by a consumer and you want to trick

6    them into installing this, here's how you do it.  You need to

7    disguise it.  You need to make it look like vacation photos.

8    You need to change the extension so that it doesn't says it's

9    an executable; that it says it's a Jpeg.  If you want to get

10   it past a firewall, you need to put it in a Microsoft Word

11   document."  So that certainly is another important factor.

12          THE COURT:  All right.  Let me ask you this, then.

13   I understand that legally the Commission can decide who they

14   want to go after; but as a practical matter, how do you

15   answer the defendants' contention that there's a large market

16   out there, a fairly established market for these products,

17   all of which can do the same thing this product does?  Why

18   are you picking on this guy?

19          MS. SHAPIRO:  I would say a few things.  As we

20   pointed out in our papers, the "but everyone else is doing

21   it" defense has never been sufficient to a law violation,

22   that somebody else --

23          THE COURT:  I conceded that in my hypothetical.

24          MS. SHAPIRO:  Okay.

25          THE COURT:  I asked, as a practical matter, why are

1   you going against him, and shouldn't this more appropriately

2   be dealt with in a rule-making proceeding?

3               MS. SHAPIRO:  Two things.  Partially why we looked

4   at this defendant is because a complaint was filed against

5   him.  Epic, which is a private organization, a number of

6   months ago now, filed a complaint about remotely

7   employable --

8               THE COURT:  A consumer complaint?

9               MS. SHAPIRO:  They are an organization, a consumer

10  organization.

11              THE COURT:  Okay.

12              MS. SHAPIRO:  A consumer privacy organization.

13  They named the defendant, which brought our attention to

14  them, and that's how we focused on their product; and we were

15  particularly alarmed by the advertisements on his website

16  that he said, "You can spy on anyone from anywhere.  You can

17  spy on your girlfriend and your boyfriend and your friend."

18  And it wasn't a product that was saying, "Parents and

19  employers, this is a useful tool for you."

20              The deceptive install guides were particularly

21  alarming to us, that they were involved in the deception and

22  that they provided these means and instrumentalities to the

23  RemoteSpy buyers.

24              And having tested the product, the invisibility of

25  it was really disturbing to us; and the vast amount of data

that we saw that it gathered, we downloaded it and tested it

and logged on to our computer and our computer lab and access

websites, and went to bank websites and entered our bank

password, and we were shocked to discover when we put our

user name in and our bank password behind asterisks, that

this program actually picked up the password, even though it

was behind asterisks.  So it was features about this product

that were very alarming to us that caused us to bring an

action against them.

THE COURT:  All right.  Let me ask you another

question.  Let's assume I enter some sort of preliminary

injunction against the defendant.  It's going to be narrowly

tailored to suit the circumstances, and the defendant's

entitled to a trial on the merits.  I would be interested to

know, obviously, with respect to the trial on this, actually

how this product has been used by the people that have

purchased it.  Is that something the Commission would seek to

obtain that information in discovery and then so when we have

a trial, you can actually show me whether this has been

abused?  Because their position is, "Look, yeah, maybe my

advertising should be changed a little bit, but this thing

really has more legitimate purposes, and I shouldn't be held

responsible for the occasional aberrant person who wants to

misuse it."

Ultimately, the trier of the facts is going to need

1    to know how it's actually been used, because that is, in

2    large part, going to dictate what the potential for abuse is,

3    just as a matter of logic.

4         MS. SHAPIRO:  Yes, Your Honor, we absolutely intend

5    to seek that discovery during this case.  We have already

6    issued a civil investigative demand to Plymus, which is the

7    service they use when the consumer wants to purchase the

8    product.  The purchase goes through them, so the customer

9    information lies with Plymus.  So we've issued a CID to them

10   and we're awaiting responses identifying the purchasers of

11   this product.

12        So in discovery, we would take discovery of these

13   consumers.  We don't anticipate that's going to be an easy

14   process.  We don't necessarily think that many of these

15   buyers are going to want to be up front with us about what

16   their honest uses are, but that's our burden and we intend to

17   deal with that in discovery.

18        In addition, we acknowledge we don't have consumer

19   declarations right now; and it's the nature of the product,

20   that it's secretly used on consumers' computers and they

21   simply don't know that this is operating there.

22        THE COURT:  Well, I presume that in discovery, you

23   can get a list of the customers who bought this?

24        MS. SHAPIRO:  Yes, absolutely.

25        THE COURT:  I guess I should say who licensed the

1    software.

2                    MS. SHAPIRO:  Yes, we will be able to get that.

3                    THE COURT:  Then you can ask those consumers what

4    computers were hacked, for lack of a better word; and then I

5    suppose you could verify their responses by checking the

6    server data of the defendant to see -- in other words, if you

7    have a consumer who says -- a licensee who says, "Well, I

8    just used it for my child's laptop in college," and it turns

9    out the defendants' record shows that he actually used it for

10   ten other computers -- I'm trying to just think of what the

11   range of discovery is going to need to be because I need to

12   set a reasonably early trial date.

13                   MS. SHAPIRO:  We intend on doing what you suggest,

14   Your Honor.  We just want to recognize that it's going to

15   be -- we're going to really have to strike a balance with

16   respecting the privacy rights of the consumers who have this

17   who have had their information stolen, unbeknownst to them;

18   that we don't want to add to the privacy violation by having

19   the federal government meddling in their information.  It

20   might be necessary in order to conduct discovery, but we're

21   going to try to be as respectful of the customers'

22   information in pursuing the case.

23                   THE COURT:  Well, yes, I understand.  How much time

24   do you think you need to prepare to try the case on the

25   merits?

1          MS. SHAPIRO:  I think -- I'm not sure we'll know

2    the exact length of time until we start conducting discovery

3    and seeing how readily available these consumers are.

4          THE COURT:  That's not a good answer.  I'm going to

5    set a trial date today.

6          MS. SHAPIRO:  Okay.

7          THE COURT:  You can confer again with your

8    co-counsel, but the "I don't know" answer doesn't get it.

9          MS. SHAPIRO:  Okay.

10          THE COURT:  So talk with your cohorts over here and

11    give me a reasonable estimate of how much time you need.

12          (Discussion held off the record.)

13          MS. SHAPIRO:  We think that nine months should be

14    sufficient, Your Honor.  We want to be as aggressive as

15    possible and we don't want to drag our feet in this.  We want

16    to get relief to consumer victims as soon as possible, but we

17    do think there might be challenges in discovery in this case.

18          THE COURT:  Okay.  Well, I was thinking more three

19    or four months, but we'll see what the defendant says,

20    recognizing you have pretty vast resources at your disposal.

21          All right.  Let me hear from the defendant.  Thank

22    you, ma'am.

23          All right.  Ms. Millner.

24          MS. GIEBLER-MILLNER:  Good afternoon, Judge.  Your

25    Honor, I just want to respond to a few of your questions,

1    provide additional clarification, before I jump into my

2    argument.

3            First of all, the remote keylogger product at issue

4    here or the target product is designed in fact to give notice

5    to computer users which -- on which the product will be

6    installed.  However, I'll acknowledge that there is the

7    option available to the consumer to turn off that notice

8    provision.

9            So -- and I would also point out, Your Honor, that

10   this feature of being able to, if you will, clandestinely

11   install the remote keylogger product onto computers is a

12   feature that is available on, to my knowledge, all similar

13   products that are remotely deployable onto computers and they

14   all, as far as I know and that's what the evidence is in the

15   record, allow the consumer to turn off the option of

16   notifying the computer user on which the product is to be

17   installed of the fact that this product is being installed on

18   their computers, and there's a reason for that and there's a

19   good reason for that and that's set forth in the declarations

20   of the consumers.

21           I don't know if you have teenage children or not,

22   but many -- the most common use of this product is for

23   parents to be able to monitor the computer activities of

24   their children.

25           THE COURT:  Yeah, but, you know, I guess you could

make a distinction there that at least in that situation, the

licensee has some sort of ownership, possession or control of

the computer.

MS. GIEBLER-MILLNER:  Sure, but not necessarily,

because in many cases this is laptop computers that they want

to install it on within the children's possession at school.

It's also being used, as set forth in these declarations,

both of Mr. Spence and the consumer declarations, that they

want to use the remote install feature to install it on

computers of children who are away at boarding school, for

example, or at college.  This is why they want to be able to

use this type of product.

In addition to that, there were -- the declaration,

I believe, of Mr. Asbury, who used it in an employee setting,

wanted to use it specifically and clandestinely so that he

could find out whether or not an employee was in fact

stealing confidential information or working with his

competitors.

THE COURT:  But, and, those are those employers'

own computers.

MS. GIEBLER-MILLNER:  And that's exactly what this

product is designed to do, Your Honor.  This product is

meant, according to the terms of the license agreement, to

only be installed on products -- I mean, on computers --

excuse me -- in which the consumer of our product owns,

1   either through an employment situation or has authorization

2   from the computer user to install it on, and that is what the

3   license agreement calls for.  Numerous times on our websites

4   we warn consumers to only utilize this product and install

5   this product on computers that they own or are authorized to

6   install it on.

7           Today is a world of telecommuting in the employment

8   setting.  Employers -- employees, rather, often are scattered

9   around the country working for their employers, and this

10   feature of being able to remotely deploy is critical.  In

11   fact, it would not be possible, frankly, to monitor these

12   types of computers unless you had that remote deployment

13   option.

14           THE COURT:  But in that situation, Ms. Millner,

15   isn't the employee generally told as part of his employment

16   relationship that, "Hey, you know, when you're using this

17   computer, this is employment-related and your use of this

18   computer is subject to being monitored"?

19           MS. GIEBLER-MILLNER:  In employee handbooks, often

20   times that is the case that it's in there.  It varies by

21   state to state.  I believe there's a statute in Florida that

22   allows employers to install -- or, rather, to monitor the

23   computing activities of their employees without notification

24   to their employees.  So there are very valid reasons, Your

25   Honor, as set forth in the affidavits of our consumers, of

1  this product for why this product provides numerous

2  legitimate beneficial uses.

3          This is a legal product.  The FTC has not chosen to

4  regulate it in any sense, instead, deciding to go after a

5  small local company run by poor Mr. Spence over here who has

6  about three percent of the marketplace and leave the

7  remaining 97 percent of the marketplace intact.

8          THE COURT:  Well, you know, I don't know that

9  they're leaving the rest there.  This may be the first and

10  easiest target they've got, but it's not to say they're not

11  in the process of going after everybody else.

12          I want to focus on the merits of this and not

13  whether this poor young entrepreneur is being picked on by

14  the U.S. government.  That's not going to go very far with

15  me.

16          MS. GIEBLER-MILLNER:  All right, Your Honor.  Thank

17  you.  Your Honor, I just want to point out a few things.

18  What the FTC is seeking to do through its injunction is

19  essentially -- not essentially -- is to put Mr. Spence and

20  Cyberspy out of business.  They want to disgorge their

21  profits.  They want to freeze all of their assets, and they

22  want to prevent the defendants from doing any -- or engaging

23  in any other business activities without first notifying the

24  FTC.

25          This is not the situation where the FTC is simply

saying, "We're unhappy with some of the content of your website. It seems you're going too far. Please change that."

They never came knocking on Mr. Spence's door saying they're -- apparently, there's a consumer complaint that was made, that I'm just learning about for the first time, that's not in the record. We've never been notified of it.

If they simply would have picked up the telephone and said to Mr. Spence, "Mr. Spence, we have concerns about some of the content of your website," we would have been happy to work with them. In fact, since I've been engaged, I've reached out to the FTC on that issue and they've refused to even consider anything short of putting us out of business because -- well, I don't know why, because Essentially --

THE COURT: Well, let me ask you this. Could he continue in business, selling a remote keylogger, if he revised his advertising and promotion, maybe have to revise the product itself -- I don't know -- but to eliminate this clandestined feature? I mean, isn't that the heart of what he's selling, the clandestined nature of this?

MS. GIEBLER-MILLNER: Your Honor, I think that if you -- if you require that the computer user -- and when I say, "computer user," so we're getting our terms straight, I mean the individual whose computer this product is --

1          THE COURT:  The person whose privacy is being

2  invaded.

3          MS. GIEBLER-MILLNER:  That's a term Your Honor

4  uses.  I would argue, Your Honor --

5          THE COURT:  I'm not using it in a legal context;

6  I'm using it in a practical human context.  Their privacy is

7  being invaded.  Their very personal communications are being

8  watched.  I mean, George Orwell would be proud.

9          MS. GIEBLER-MILLNER:  Their personal communications

10  are being made on computers owned by the consumer of these

11  products or on which the consumers of these products have the

12  authority to install this product on, if the consumer is

13  abiding by the terms of our license agreement and heeding the

14  warnings that are contained on our website.

15          THE COURT:  But I won't know that until we get to

16  trial on the merits.

17          MS. GIEBLER-MILLNER:  Well, Your Honor --

18          THE COURT:  I mean, if you've sold -- what has he

19  sold?  Eleven thousand copies of this software have been

20  licensed?

21          MS. GIEBLER-MILLNER:  Just over, according to our

22  records.

23          THE COURT:  I mean, if 10,000 of them have been

24  used to get people's credit card numbers, then that's one

25  thing.  If all but one percent have been used for purposes

1    contemplated by the license agreement, well, that's something

2    else; but I won't know that.

3          MS. GIEBLER-MILLNER:  The word is "if," and the

4    reality is that the FTC, with all its vast resources, has had

5    at least three months, because that's when we know Mr. Good

6    was retained -- when Dr. Good was retained, it could have

7    been more, three months to investigate this.  In the three

8    months --

9          THE COURT:  But they've got no way to ascertain the

10   answer to my question without discovery; and, you know, until

11   the lawsuit is filed and we engage in some discovery, they're

12   not going to have any ability to find that out.

13         MS. GIEBLER-MILLNER:  Your Honor, with all due

14   respect, I think there certainly was a way for them to find

15   this out.  They work in -- they work hand in hand with their

16   fellow colleagues at the Department of Justice or in law

17   enforcement.  As far as I know, they have not made any

18   efforts to walk down the road in Washington to see if the

19   Department of Treasury ever heard of an instance where

20   remote key -- where the target product made by my client was

21   used ever to commit any crimes.  It's certainly not included

22   in the records.

23         How difficult could it have been for the FTC to

24   simply walk across to the street to the Department of

25   Treasury to say, "Hey, have you had any instances where this

1    product, this particular product, was used to commit any

2    crime involving identity theft?"

3              THE COURT:  Well, you've obviously never worked for

4    the federal government --

5              MS. GIEBLER-MILLNER:  Well, Your Honor --

6              THE COURT:  -- because if you think it's easy to

7    get an answer from one agency to another -- I wish it were

8    that easy.

9              MS. GIEBLER-MILLNER:  Your Honor, with all due

10   respect, I think that before you go to destroy a person's

11   livelihood, you should at least make efforts to find a

12   victim.  We have no victim here.  We don't even have a

13   circumstance where they can describe with any accuracy of an

14   occasion where this product was ever used once to -- by

15   anyone to commit any harm to anyone.

16             THE COURT:  I concede that's a problem.  The

17   Commission's position is that the potential for harm is so

18   grave, that we should kind of undo this until we can find out

19   what's really going on.  That's basically their position.

20             MS. GIEBLER-MILLNER:  I understand that, and the

21   potential for harm exists with a variety of products that

22   exist on the marketplace and -- including our competitors'

23   products.  If we're going to allow the federal government to

24   go in and shut down the business and destroy the livelihood

25   of individual citizens of this country without any victims,

without any harm, just on the potential that a product could

cause harm, I would suggest, Your Honor, that a variety of

products, including firearms, for example, et cetera, would

be put out of business because there always exists that

potential for harm.

What we don't have here, Your Honor, is any, first

of all, victim.  We don't even have any testimony from the

FTC, from any expert.  The only expert in identity theft

that's been retained in this matter is from the defense.  We

don't have anyone whose even testified that these commercial

products of this nature, the remote keylogging products of

this nature, are even typically used to commit identity

theft.

Instead, what we have is the Declaration from Eric

Laken, who has testified under oath that he is involved in

the investigation of identity theft incidences and, according

to his testimony, unrebutted since they didn't bother to

retain an expert, that these type of products are simply not

used by perpetrators to commit identity theft typically.

Obviously, you can never say that for every case, but they're

typically not the favorite tool of the -- of a perpetrator of

identity theft, for a variety of reasons, not the least of

which is you have to pay $100 a license per computer in the

hopes that the person would install it, in the hopes that the

person who installed it actually has some information that's

1   worth obtaining, and also leaves a record or a paper trail

2   that would of course be available to law enforcement, should

3   they get wind of this nefarious activity.  That is Mr.

4   Laken's testimony, again unrebutted.  No one has come forward

5   on behalf of the FTC to say commercial remote keylogging

6   products, much less the target product, is even commonly

7   used, typically used, recognized as being useful.

8           THE COURT:  Slow down a little bit.  There's smoke

9   coming out of Diane's machine.

10          MS. GIEBLER-MILLNER:  I'm sorry.  I'm just very

11  passionate for my client, Your Honor.

12          THE COURT:  You can be passionate, but, you know,

13  we're still in the South here.  Slow down a little bit.

14          MS. GIEBLER-MILLNER:  The New Yorker is coming out

15  of me.

16          THE COURT:  That's all right.  I love New Yorkers,

17  but they talk too fast.

18          MS. GIEBLER-MILLNER:  All right.

19          THE COURT:  John's a New Yorker.  This is John over

20  here.

21          THE COURTROOM SECURITY OFFICER:  I understand her.

22          MS. GIEBLER-MILLNER:  You see.  We're communicating

23  just fine.

24          THE COURT:  I understand her.  I just don't think

25  Diane can transcribe that fast.  Go ahead.

1           MS. GIEBLER-MILLNER:  What I was saying, Your

2    Honor, is that there's not even evidence from the FTC in the

3    record that this is a tool -- this type of product, much less

4    the target product, is the kind of product used by people

5    wishing to commit identity theft.  The best they came up with

6    in their response was two newspaper articles where a remote

7    keylogger product of some sort, not the defendants' product,

8    as far as we can tell, was used to -- by one person to commit

9    or at least attempt to commit, unsuccessfully, identity theft

10   and by some college students at FAMU to change their grades

11   and residencies.  That's the best they've come up with so

12   far.  Again, there's not a lick of evidence that the target

13   product was even associated with those two incidences.

14           I believe Your Honor should hold them to a higher

15   standard than that.  At a minimum, I believe Your Honor

16   should require that they at least have consulted with an

17   expert who could testify about the manner in which identity

18   theft is commonly committed in this country.

19           THE COURT:  Okay.  I understand identity theft.

20   This may not be the tool of choice for those professionals

21   who are engaged in that nefarious activity.

22           I think the other potential abuses of this -- and

23   here, this is not an empirical-based conclusion, but it seems

24   to me that the use by stalkers and that sort of relationship

25   is probably more problematic.  I don't know if that's true or

1    not, but I'm just saying I recognize the deficiencies in the

2    government's example of identity theft as being maybe not

3    their strongest argument.

4              MS. GIEBLER-MILLNER:  If I could then address the

5    potential use by stalkers of victims of domestic abuse.

6    Again, we still don't have a victim, but let's put that aside

7    for a minute.

8              Typically in most --

9              THE COURT:  How are they going to have a victim?

10   These people don't even know they're being stalked.

11             MS. GIEBLER-MILLNER:  Well, Your Honor, in many

12   ca -- according to Ms. Southwick (sic), she's aware of some

13   examples.  We have been provided with no details of that,

14   of course; but the reality is that in a stalker situation,

15   most likely or, you know, in that situation, at least even

16   according to some of the descriptions provided by Ms.

17   Southwick, as sketchy as they were, or Southworth -- I'm

18   sorry -- the stalker is married to the victim and has access

19   to the victim's computer.

20             THE COURT:  But you're changing the hypothetical

21   again.  If it's the customer's computer, then that's not the

22   problem.

23             MS. GIEBLER-MILLNER:  Well, again, Your Honor, what

24   the FTC is seeking to do -- and, remember, they're bringing

25   this under the FTC Act, which -- 45(a) of the FTC Act, and in

1    order to meet their burden under that Act, they have to

2    show -- and I'll. . .

3            THE COURT:  If this guy is using this for the

4    benign purposes you suggest, why does he develop it in such a

5    way that the perpetrator can't be tracked?  I mean, it's one

6    thing to clandestinely install this on a computer; but when

7    the user finds out their privacy is being invaded, they can't

8    even figure out where it came from.

9            MS. GIEBLER-MILLNER:  Your Honor, my response to

10   that, this is what is -- is being advertised in the

11   marketplace.  That's what the features are of the products of

12   this nature.  In order to be competitive in the marketplace,

13   this is what -- the features that the consumers demand.  They

14   don't want their teenage kids, who are more savvy than they

15   are with computers, to be able to figure out and easily be

16   able to eliminate or remove this monitoring software from

17   their computers.

18           THE COURT:  Well, that wasn't my point.  It's one

19   thing for these sophisticated teenagers to figure out they're

20   being monitored.  It's another thing to find out, well, you

21   know, it's mom that's doing it.  And apparently you're saying

22   the marketplace doesn't even want the child to know that it's

23   mom that's doing it once they discover it's being done.

24           MS. GIEBLER-MILLNER:  Your Honor, the

25   marketplace -- all I can tell you is that -- and this is

supported by the Declarations of the consumers, that they did

not want their children to know that they were being

monitored and they didn't want their children to be able to

tinker with it, if you will, and remove this ability and

capability that these parents had because this is something

that's -- excuse me.

(Discussion held off the record between Ms.

Giebler-Millner and Mr. Ivy.)

MS. GIEBLER-MILLNER:  My -- Mr. Ivy reminds me that

in fact in a couple of the Declarations, the consumer

Declarations, they pointed out that their children were savvy

enough to be able to somehow circumvent this monitoring

software.  Some of these teenage kids out there are quite

savvy with the computer and that's why these what you call

clandestined elements of the software are necessary.

But going back again to the FTC Act, in order to

show a violation, the FTC must show that, first, the

defendants committed a deceptive act.

We don't have a deceptive act.  I mean, no one's

alleging that Mr. Spence used this software to cause harm to

anyone.  He is selling a legal product and, according to the

FTC, advertising or describing the functionality of this

program on his website in a manner that's consistent with the

functionality of the program.  So there's no

misrepresentations being made to the consumers.  The

consumers are the ones buying this product.

Again, not surprisingly, we don't have any complaints, at least from any consumer of this product that I'm aware of, about this product.

Second, they must show that that deceptive act is likely to mislead consumers acting reasonably.  That's a requirement that the FTC acknowledges they must show.

I submit to Your Honor, and I realize it's early in the case, but I submit to Your Honor that the FTC will never be able to show that the defendants committed an act -- deceptive act that misled consumers acting reasonably.  Why? Because the consumers that the FTC is describing are individuals who want to take this product, violate the terms of the license agreement that they're required to agree to before purchase, ignore the warnings on the defendants' website to only install on appropriate computers, and in fact, if you follow the FTC's example, commit a variety of violations of criminal law.  Under no definition can that possibly be considered a consumer acting reasonably.

So I would submit to Your Honor that there's no way, assuming that their theory was true, assuming that people are using this product to commit the acts they claim, which of course there's no evidence of, but even if they managed somehow to do so and to find such evidence, they can never show the requirement that the defendants' deceptive act

```
 1    misled consumers acting reasonably; and, finally, they must
 2    show that the act is to the consumers' detriment.  Again --
 3              THE COURT:  Well, okay.  I mean, that argument just
 4    limits consumer to the licensees.  I mean, the licensees know
 5    full well what they're doing.  They're not dissatisfied.
 6    And, in fact, the better this thing and the more clandestined
 7    and the more violation of privacy there is, the happier the
 8    consumer is.
 9              But the FTC argues that its authority and
10    jurisdiction goes beyond that, to protect those people out
11    there who are being abused, if you want to just coin a term,
12    by this product, and that you can't just stop and look at the
13    licensor, who is, you know, the person making this possible.
14              I mean, obviously the people he sells it to aren't
15    being deceived.  They are buying it in order to deceive
16    others.  That's the whole purpose of the product.
17              MS. GIEBLER-MILLNER:  But those are the consumers
18    of this product.  They are the consumers, which the FTC Act
19    that they are relying on is intended to protect.
20              THE COURT:  Okay.  Well, that's a legal argument.
21    I don't think you're right about that, but I'll revisit that
22    back in my chambers.
23              MS. GIEBLER-MILLNER:  Finally, if I may, Your
24    Honor, if we can go back to the argument about the other
25    competitors out there, I submit, Your Honor, that -- and,
```

1  of course, this is not disputed in the record.   The record

2  shows that this is a small player in this remote keylogger

3  product marketplace.

4            THE COURT:  Yeah, but they've got a really big law

5  firm.

6            MS. GIEBLER-MILLNER:  Well, Your Honor, I -- I -- I

7  think that the FTC is surprised by that.  I'm sure that they

8  thought that he wouldn't have the resources to -- to -- to

9  fight this, and, you know, this is -- obviously, they're

10  coming full -- fully armed at him, and he needed to have

11  representation to protect himself.

12            THE COURT:  Well, I --

13            MS. GIEBLER-MILLNER:  But the bottom line is -- the

14  bottom line is that in order to show they have standing in

15  this case, not only do they have to show -- and this is

16  Article III standing -- not only do they have to show that

17  there's an actual or imminent injury, which they haven't and

18  can't, at least not at this stage, or that the harm is caused

19  by the defendants' actions, which they haven't and can't, but

20  more critically and what's more damaging to their case is

21  that they have to show that the harm will be redressed by the

22  action that they seek or the remedy, I should say, that they

23  seek in this case.

24            There's no way that an injunction, even the far

25  reaching punitive injunction that the FTC is seeking to have

1   imposed here, will satisfy any of those -- will redress the

2   harm cited by the FTC of protecting the public, if you will,

3   from products of this nature or from having their privacy

4   violated.   Why?   Because what this injunction will do is put

5   the defendants out of business, and that small void left by

6   the disappearance of the target product from the marketplace

7   will guaranteed be filled by the 97 percent of the remaining

8   marketplace, who will be easily able to capture that small

9   segment left and continue to sell these type of products.

10          So, Your Honor, the harm that they seek to prevent

11   will not be redressed by simply eliminating the small fish in

12   the pond, if you will, from the marketplace, and that is a

13   standing requirement.   And before I submit, Your Honor, we

14   even go down the road of setting trials and trying to, you

15   know, enter injunctions, we must, Your Honor, we must at

16   least figure out whether there's standing here.

17          The FTC says we're operating under the statute.

18   Fair enough.   I submit they still have to show Article III

19   standing.

20          I am not debating that they have the right to

21   pursue their remedy in the name of the public and to protect

22   the public's harm.   I'm not denying that; but what I'm saying

23   is that before we even get to square one, if you will, we

24   have to start with standing.   Standing, I submit to Your

25   Honor, can never be shown here because, again, the eminent

1   harm can't be shown.  Even if it could, it wasn't caused by

2   the defendants' action but by some third-party consumer over

3   which the defendants have no control, in violation of their

4   license agreement, in violation of the warnings on the

5   website, and in violation of criminal law.  And the

6   injunction sought by the FTC will in no way redress that harm

7   because the consuming public will continue to have these

8   products with the same features available to them.

9           THE COURT:  Let me ask you the same question I

10  asked your colleague on the other side of the podium.  When

11  would you like to try this case?

12          MS. GIEBLER-MILLNER:  I would like to try it next

13  week, Your Honor.

14          THE COURT:  Well, that's obviously not reasonable.

15          MS. GIEBLER-MILLNER:  Well, Your Honor, the reason

16  I didn't say that, I'm not trying to be coy, but the reality

17  and the matter is that my defendant, my client, is out of

18  business.  He has no means of income right now.  They've shut

19  down his websites.  They shut down -- he can't even sell the

20  products that are not the target products since they've shut

21  down his accounts with Plymouth (sic), his E commerce

22  provider.

23          So, quite frankly, the idea of waiting nine months,

24  there's no sense.  At the end of nine months, there will be

25  nothing left to defend because the defendants' business will

1    be shut down and, frankly, the FTC will have accomplished

2    their remedy simply by the delay of time.

3            So I would ask Your Honor that if the TRO is going

4    to continue and the defendants are not permitted to continue

5    in business, that we need a very, very fast trial date.  If

6    the TRO is lifted and we're able to continue in business, I

7    think more time could be afforded at that point; but waiting

8    nine months, even three months, quite frankly, Your Honor, I

9    think will result in the remedy, quite frankly, that the FTC

10   is looking for and that is putting Mr. Spence and CyberSpy

11   permanently out of business.

12           THE COURT:  All right.  Thank you.

13           MS. GIEBLER-MILLNER:  Your Honor, if I can just

14   make one closing statement, and I would like to do so by

15   citing to someone who the FTC touts as a, quote,

16   "internationally recognized person with the greatest

17   experience in the intersection of technology and domestic

18   violence," and that's Ms., of course, Cindy Southworth, and

19   she was quoted in an article that she cites in her report --

20           THE COURT:  I've read it.  I've read it.  I've read

21   it.

22           MS. GIEBLER-MILLNER:  Okay.  So, again, I guess,

23   Your Honor, it's not the technology that's causing the

24   problem here; it's the individuals who abuse technology that

25   are the -- that is causing the problems.  Going after

1    manufacturers that criminals use to commit crimes is a

2    slippery slope, that I don't know where that would end, that

3    could implicate dozens of products that just come to my mind

4    off the top of my head, not the least of which is GPS

5    devices, firearms, even, you know, high-powered binoculars,

6    et cetera.  All products have the ability of being abused.

7    What the FTC is trying to do here is hold the manufacturer of

8    that product accountable for the abuses of their consumers,

9    which they have no control over and no knowledge of.

10              THE COURT:  All right.  Thank you.

11              MS. GIEBLER-MILLNER:  Thank you, Your Honor.

12              THE COURT:  All right.  Ms. Shapiro, I'll give you

13    the final word on this.

14              MS. SHAPIRO:  Thank you, Your Honor.  Your Honor,

15    RemoteSpy is not a GPS device.  It's not a pair of

16    binoculars.  It's not a telescope.  This product is designed

17    with particular features that don't make it a neutral product

18    or, as I believe they refer to it in their papers, any

19    seemingly innocuous product.  A product that includes a

20    remote installation particularly needed by individuals that

21    don't have physical access or ownership to a computer, that

22    includes a feature that you could disguise the executable in

23    an e-mail to make it look like it's something innocuous, like

24    vacation photos, instructions that are provided to walk you

25    through step by step how to effectuated this, an undercover

1    e-mail service advertised as allowing you to deploy the

2    software without being traced, these features are not part of

3    an innocuous product.   They are features that are part of the

4    product that are made and intended for it to be used in this

5    particular unfair and deceptive manner.

6          Moreover, even if there are some conceivable legal

7    purposes to this product, if it could be used legally in a

8    manner that doesn't render the sale of the product legal --

9    there are many products that are sold that do have

10   conceivable legal purposes that courts have held it still

11   violates the FTC Act.

12         THE COURT:  But the mere possibility that a product

13   can be misused certainly doesn't make that product illegal to

14   be sold.   There has to be, it seems to me, some showing that

15   there's a probability of misuse and harm.

16         MS. SHAPIRO:  Certainly, Your Honor.  For example,

17   in U.S. versus Herring, which was an Eleventh Circuit case,

18   it was a Federal Trade Commission case, it was a wiretap

19   case, the defendants modified cable decoders, which were

20   legitimate products, and sold them so that users could use

21   them to descramble capable TV signals, which violated the

22   Wiretap Act.  They said, "Look, it's not us; it's the buyers.

23   We just sell this.  There are legitimate uses for this

24   product.  It's not us.  They're the ones who did it."

25         And the Eleventh Circuit said, "Look, the

1    distinctive features of this product that render it primarily

2    useful as an interception device to intercept electronic

3    communications render this product illegal."

4            And I would submit that it's similar.  The

5    distinction features of RemoteSpy that lend it to be used for

6    the remote install, the secret install, to deceive the

7    consumers, not to mention the undercover e-mail, these are

8    the features that render this product unfair and deceptive.

9            THE COURT:  Well, you know, like anything, you can

10   cite the wiretap case, and we had a wealth of those, a rash

11   of those come up here, you know, there's a balancing test

12   here, and the problem is I'm being asked to balance before I

13   know what weight's on each scale.

14           MS. SHAPIRO:  Certainly, Your Honor.  That's

15   largely what the Federal Trade Commission Act and fairness

16   statute.  The second factor is, do the countervailing

17   benefits outweigh the substantial injury?  And we would

18   submit that any conceivable countervailing benefits certainly

19   don't outweigh the substantial injury that is --

20           THE COURT:  Substantial potential injury.  That's

21   the problem here.  We don't have evidence of any actual

22   injury.

23           MS. SHAPIRO:  The standard is, Your Honor, is

24   actually -- for this stage, it's not an actual injury; it's

25   likely to cause.  So unfairness says an act causes or is

1    likely to cause injury.

2           THE COURT:  I understand.  But you keep talking

3    about injury, and, I mean, I think we all agree that the real

4    issue here is the potential for injury because we don't

5    really know, until we get some actual discovery, whether this

6    product has been abused or not.

7           MS. SHAPIRO:  That's true, Your Honor.  And

8    defendants don't -- they don't seem to seriously dispute the

9    notion that if an unauthorized user got access to the type of

10   information that's gathered by RemoteSpy, that that would be

11   injurious to consumers.

12          What they do seem to dispute is whether or not

13   authorized users are using the product.  Due to the

14   advertisements, these features, the undercover e-mail, I

15   would submit that those features make it evident that the

16   product is being used by unauthorized users.

17          THE COURT:  Okay.  Well, I appreciate your papers

18   and your arguments.

19          MS. SHAPIRO:  Your Honor, can I address one other

20   issue?

21          THE COURT:  Okay.

22          MS. SHAPIRO:  Only because the license agreement

23   was mentioned so many times, so I felt like we should respond

24   to it.

25          THE COURT:  Okay.

1          MS. SHAPIRO:  I just wanted to point out two things

2     about the license agreement.  One, it's buried in the

3     website.  It's many screens in.  It's not immediately shown

4     to people who access this.

5          THE COURT:  Well, it's the typical you check a box

6     if you agree to the terms of the license?

7          MS. SHAPIRO:  Right.  Many screens in, you check a

8     box, "I agree to the terms."  You don't -- it's not

9     unavoidable.  It's not presented to you.  You don't have to

10    read them.  But even if they were splashed across the screen,

11    it's irrelevant because they're a wink, wink, nod, nod.  What

12    the defendant is essentially doing is saying, "Hey, RemoteSpy

13    buyers, I have this product.  You can spy on anyone.  You can

14    spy on your friends.  You can spy on your lover.  You can spy

15    on your girlfriend.  Here's how you can do it.  I'm going to

16    walk you through this step by step.  And, then, oh, by the

17    way, you actually can't use the product in all the ways I've

18    just told you that you can use it and how I've explained to

19    you to use it."

20         So, at the risk of being crass, the license

21    agreement is a CYA.  It's without legal substance.

22         THE COURT:  Okay.  Well, I assumed that was your

23    position.  I was aware of that.

24         MS. SHAPIRO:  Thank you, Your Honor.

25         MS. GIEBLER-MILLNER:  Your Honor, if I can just

1    respond to distinguish the Herring case she brought up just

2    now --

3              THE COURT:  Okay.

4              MS. GIEBLER-MILLNER:  -- because it's easily

5    distinguishable.  First of all, Your Honor, that was a case

6    in which a defendant was convicted by a jury of violation of

7    the Wiretap Act, and the reason for that is because they

8    found that the descrambling capable machine that was at issue

9    there to commit the wiretap violations was -- that the

10   primary use of that product was to in fact engage in wiretap

11   violations.  That's not what's being shown here.  The primary

12   use, as the record evidence shows, is to use this product in

13   a legitimate way, and in fact --

14             THE COURT:  I don't know what the primary use is.

15             MS. GIEBLER-MILLNER:  Well, that's what the record

16   evidence is at this point.  There's no evidence to the

17   contrary, and that's what the intended use is.  This is not a

18   situation where we're looking to just change some language on

19   a website.

20             THE COURT:  I understand, but you keep telling me

21   what the primary use is, and I think we can all conclude at

22   this point we don't know how it's been actually used.

23             MS. GIEBLER-MILLNER:  I think the record evidence

24   says otherwise.  I think the record evidence shows as to Mr.

25   Spence that the primary use, based on his understanding

1  and --

2          THE COURT:  Well, how would he know how it's being

3  used?

4          MS. GIEBLER-MILLNER:  Well, he -- he -- he's

5  constantly -- he talks to his consumers.  He knows how his

6  consumers are using the products, and that's how he's able to

7  testify.  Obviously, he hasn't spoken to every single

8  consumer, but he understands the market.  He understands how

9  these products are used and --

10         MS. SHAPIRO:  Your Honor, I would suggest that the

11 users that are using this --

12         THE COURT:  Now, wait a minute.  That's not

13 appropriate to interrupt counsel.  When she's standing, it's

14 her --

15         MS. SHAPIRO:  I apologize, Your Honor.

16         THE COURT:  We can actually have a tennis match

17 here, if you want, and I'll go back and work; but that's not

18 the way we do things down here, okay?

19         MS. SHAPIRO:  I apologize, Your Honor.

20         THE COURT:  Go ahead.  Finish your comment.

21         MS. GIEBLER-MILLNER:  I was just saying that he's

22 been in the industry for five years.  He's spoken to many

23 consumers.  He knows how his product is used.  Granted, I

24 agree that somebody may not call him up and say, "By the way,

25 I'm using your product to commit wiretap," or, "to commit

identity theft," or, "to stalk my abused ex-wife."  Granted,

he hasn't heard of that; but he's only been involved, Your

Honor, or heard of four investigations from law enforcement

involving his product, of which only two involved misuse of

the product, and he assisted with that law enforcement

investigation.

I submit to Your Honor that if this product was

being used by licensees all over the place to commit these

crimes, that Mr. Spence would have heard from the law

enforcement a lot more than four times of which only two

actually involved potential misuse.

THE COURT:  I don't know.  If Mr. Spence is as good

as he says it is, none of these people know they're being

watched.  How would they know whether -- they wouldn't even

know.

MS. GIEBLER-MILLNER:  But they would know if

they've been a victim of identity theft and they certainly

would know if they're being stalked.

THE COURT:  Wait a minute.  Not necessarily, I

mean, because, as I understand it, they can't even figure out

how the person got this information.

MS. GIEBLER-MILLNER:  Well, how are we ever going

to get that information?  I mean, if that's the case --

THE COURT:  Well, I don't know, but that's for

another day.  It seems to me that's the issue.

1          MS. GIEBLER-MILLNER:  Well, Your Honor, I would ask

2    that, at a minimum, that Mr. Spence at least be allowed to

3    continue in business while -- you know, while we discover the

4    case or allow the FTC to discover their case.  This is his

5    livelihood.  He has no other means of support; and, you know,

6    to put him out of business --

7          THE COURT:  I understand.

8          MS. GIEBLER-MILLNER:  -- is just not fair, Your

9    Honor.

10         THE COURT:  I have to do a lot of things that don't

11   seem fair.

12         Do you have something final you wish to say now?

13         MS. SHAPIRO:  I would just respond to a couple of

14   points.  Fifty-eight percent are -- FTC surveyed.

15   Fifty-eight percent of identity theft victims have no idea

16   how they were a victim of identity theft.  If you find out

17   your identity is stolen, the vast majority of the time you

18   don't know that it was a keylogger program like RemoteSpy on

19   your computer.

20         THE COURT:  Okay.  That's point one.  I'll give you

21   one more.

22         MS. SHAPIRO:  Okay.  I will take that a lot was

23   made about us picking on a small competitor in this market.

24   As I mentioned, we have prosecutorial discretion to decide

25   who we proceed against; but I will also mention Mr. Spence

1    has brought in over a million dollars since 2005, which is

2    nothing to shake a stick at, and is certainly doing better

3    than this government attorney.  So we weren't surprised that

4    a large law firm showed up.  He's been quite successful, and

5    there are 13,000 licenses sold and that's not an

6    insignificant amount of consumers who are being affected by

7    this product.

8              THE COURT:  Okay.  Thank you.  I'll try to get

9    something out, if not today, by tomorrow.

10             (The proceedings were terminated at 2:55 p.m.)

11                      - - - - - - - -

12                    Reporter's Certification

13   I certify that the foregoing is a correct transcript from the

14   record of proceedings in the above-entitled matter.

15                           s/Diane Peede, RMR, CRR
                             Official Court Reporter
16                           United States District Court
     Date:  December 17, 2008    Middle District of Florida

17

18

19

20

21

22

23

24

25